REPUBLIC BANKERS LIFE INSURANCE COMPANY; American Reserve Life Insurance Company; and Harold P. Altshuler, Appellants,

v.

Keith A. WOOD; Bankers United Life Assurance Company; NN Investors Life Insurance Company, Inc.; United Group Agencies, Inc.; United Group Companies, Inc.; United Group Association; United Insurance Companies, Inc.; and Ronald Jensen, Appellees.

No. 2–88–217–CV.

Court of Appeals of Texas, Fort Worth.

June 6, 1990.

McGregor, White, Malesovas & McSwain, Andy McSwain and John L. Malesovas, Waco, for appellants.

Newman & Davenport, P.C., J. Kent Davenport, Figari & Davenport, Mark T. Davenport and Andrew G. Jubinsky, Dallas, J. Michael Jaynes, Irving, for appellees.

Before WEAVER, C.J., and FARRIS and LATTIMORE, JJ.

## OPINION

LATTIMORE, Justice.

This is an appeal from a take-nothing summary judgment in favor of: Keith A. Wood; Bankers United Life Assurance Company; N.N. Investors Life Insurance Company, Inc.; United Group Agencies, Inc.; United Group Companies, Inc.; United Group Association; United Insurance Companies, Inc.; and Ronald Jensen, who were defendants in a consolidated suit brought by: Republic Bankers Life Insurance Company; American Reserve Life Insurance Company; and Harold P. Altshuler, asserting causes of action for: breach of contract; tortious interference with contracts and business relations; breach of fiduciary duty; fraud; civil conspiracy; and unjust enrichment.

We reverse and remand.

The genesis of the disputes under consideration arose out of the association of appellant Altshuler and appellee Wood in 1978 when Wood became a general agent of Republic Bankers Life Insurance Company ("Republic"), American Reserve Life Insurance Company ("American"), and Paramount.[1] Altshuler owned 99% of Republic and American, which were engaged in providing primarily hospitalization insurance through a general agency marketing system. Republic, in turn, owned all of the stock in Paramount, another insurance company. American was authorized to do business only in Oklahoma, whereas Republic and Paramount were licensed only in Texas. According to Altshuler, Wood "did an outstanding job" and, by the end of 1979, his agency had grown to a point where Altshuler and Wood were interested in expanding their respective businesses by Altshuler making a "fronting arrangement" with another company to enable him

---

1. This summary of facts follows the recitals of    appellant Altshuler, in his deposition.

and Wood to do business outside of Texas and Oklahoma.

In the latter part of 1980, Altshuler came across Life Investors, Inc., a company whose chief operating officer was Ronald Jensen. In conversations with Jensen, Altshuler expressed an interest in either a fronting, a coinsurance, or a reinsurance arrangement. His deposition testimony explained that in a fronting arrangement, the writing company receives the benefits and risks of writing policies in the name of the other company and pays a small percentage of premiums to the company whose name is used. In a coinsuring arrangement, both companies share in the benefits and risks without regard to which company issues the policy. In a reinsurance arrangement, one of the companies reinsures a part of the risk for a specified amount of money. In initial discussions, Jensen seemed interested in a coinsurance arrangement and Altshuler testified that Jensen understood the Texas and Oklahoma business of Altshuler's companies would not be affected nor would Altshuler's companies be able to handle the financing or reserves incident to the proposed arrangement. It was contemplated that Wood would be appointed as general agent for the Jensen companies. The contracts first submitted by Jensen were not satisfactory but the terms of a new contract were agreed to by the end of March 1981. According to Altshuler, he received a draft of the new agreement and Jensen was to fly to Dallas on April 1, 1981, for signatures and closing. By that agreement, Republic would coinsure on a 50/50 basis the insurance to be written on policy forms of NN Investors Life ("NNIL"), an affiliate of Life Investors, Inc. by the Wood Agency outside of Texas and Oklahoma. NNIL would provide financing and put up the required reserves and Republic would administer the program. The financing referred to is the procedure of paying to the agent the first year's premium in advance, upon the sale of a new policy, and the debiting of the agent's account for any of the first year's premium not collected by the company.

On the evening before Jensen was due in Dallas, Wood came to Altshuler with a request that he be permitted to participate in coinsuring the business he wrote. He suggested a one-third participation. Altshuler agreed to ask Jensen about Wood's proposal. Jensen, when informed of Wood's request, said it could be done but some of the terms of the contract would have to be changed. Consequently, the proposed closing did not occur on April 1. About a week later, Jensen sent down a new draft of agreement providing for Wood to have an option to coinsure one-third of the business but requiring Republic to accept financing responsibility. Altshuler rejected Jensen's new proposal, telling him that from the beginning Altshuler had made it clear that he could not afford to provide agency financing. Jensen then suggested Altshuler get Wood to accept less than one-third. Altshuler tried, but Wood was adamant about his share. Finally Wood announced to Altshuler that he was going to make the deal directly with Jensen. Altshuler responded that there would be no deal with Jensen unless he, Altshuler, was included. On April 24 Wood signed a letter to Altshuler in which he stated:

> Ron Jensen has agreed to work a "50/50 arrangement" with my agency. When I exercise this option with my 50 per cent of the coinsurance agreement or at any time within three years, at a time approved by you if you wish to participate, I will assign 25 per cent (½ of 50%) to your Company or I will assign 50 per cent of my profits of the asset shares of the business to you, at your choice.
>
> Also, I will assign you $5 of the registration fees collected on any hospitalization applications written.
>
> This agreement can be further drawn up in legal form by you or your attorneys, if you prefer, for further consideration.

The words "ACCEPTED BY" appear on the letter above the signature of Altshuler. We shall refer to this agreement as the "50/25 agreement."

Shortly after the above agreement, Wood came to Altshuler requesting that he be allowed to write the Texas and Oklahoma

business through NNIL with Altshuler's companies coinsuring 75% of that business. Altshuler agreed, and received a letter, dated May 22, 1981, from Thomas F. McCartan stating the understanding of NNIL regarding the arrangements agreed to by NNIL, Wood, and Altshuler. McCartan had been part of Jensen's negotiating team throughout, and his letter summarizes the agreement for an initial term of three years, as follows:

1. Wood agency would continue to write life policies in Texas through Republic, and, in Oklahoma, through American. No coinsurance on those policies.
2. Life insurance business written outside of Texas and Oklahoma would be written through Bankers United and the health business written outside Texas and Oklahoma would be through NNIL.
3. Wood has the right within three years to designate an insurance company to coinsure 50% of the business outside of Texas and Oklahoma and NNIL understands Altshuler has a right to participate in the 50% of the business coinsured by that insurer under a separate arrangement.
4. Some health insurance in Texas and Oklahoma would be issued by NNIL of which Altshuler desires to coinsure 75 per cent, and providing financing to cover 75 per cent of that business.
5. The financing for the business written outside of Texas and Oklahoma is a matter between Bankers United, NNIL, and Wood Agency.
6. The financing of the life business in Texas and Oklahoma is a matter between Altshuler and Wood.
7. The financing of the health insurance business written in Texas and Oklahoma would be funded 75 per cent by Republic and American and 25 per cent by NNIL with recovery of agents' debit balances to be allocated on the same basis.
8. Administration of the plan would be provided by NNIL with administrative fees charged against the total earned premium for the health business issued by NNIL not to exceed 10 per cent of such premium in any one calendar year.

McCartan's letter concluded with the following language:

Hal, I am pleased we were able to work out an arrangement in the overall which allows us all to participate in the business and which lets Keith continue to write business and us underwrite it. (Us, in this sense is you and us.) I am looking forward to a good on-going relationship.

If this fairly represents your understanding of the principles of our agreements, please sign below and we'll go from here.

The letter was signed by Altshuler and Wood, as individuals, on June 2, 1981. This agreement will be referred to as the "75/25 agreement."

Subsequently, there was written a draft of a reinsurance [2] agreement signed by Republic and American but never executed by NNIL or Bankers because of a disagreement regarding the termination clause. Consequently, no written coinsurance agreement was signed by the parties affected by McCartan's letter agreement. Altshuler testified that the "actual mechanics" of their oral agreement as to the Texas and Oklahoma business went into effect immediately, by which "we were financing the agents and sending them money for it and they were sending us reports." In April 1982, McCartan advised Altshuler that the Texas state insurance authorities were demanding a copy of the coinsurance contract which had apparently been listed by NNIL in its annual report to the state. When Altshuler told him that they had an oral contract which he had been advised was "all right," McCartan said "I'm orally rescinding it then." However, the parties continued to operate under the original arrangement until August 1982. On Decem-

---

2. This instrument is referred to by Altshuler as a reinsurance agreement, but from the context is ostensibly a coinsurance agreement in accordance with Altshuler Deposition Exhibit 3.

ber 30, 1983, Altshuler wrote to McCartan calling attention to his letter of May 22, 1981, and requesting a "history of the business written" by Wood to enable him "to make a determination as to whether to provide such reinsurer." The information sought was never provided.

The inclusion of: United Group Agencies, Inc.; United Group Companies, Inc.; United Group Association; and United Insurance Companies, Inc. in this litigation is explained by the following recitals of appellants' brief.

In March 1982, Jensen terminated his relationship with NNIL and Bankers. At about the same time, Jensen entered into a "consulting agreement" with Wood. This "consulting agreement" gave Jensen 20% of Wood's pre-tax earnings generated under Wood's coinsurance agreement with NNIL and Bankers. On April 1, 1982, Wood gave Altshuler notice that he was terminating his agency agreements with Republic and American, effective April 15, 1982. At about the same time, in April 1982, NNIL and Bankers purportedly terminated their 75/25 coinsurance agreement with Republic and American.

Wood also purchased Summit Life Insurance Company in or around this same time period. He thereafter changed the name of Summit Life to United Group Insurance Company ("UGIC"). In addition, Wood incorporated his insurance agency and changed the name to United Group Agencies, Inc. ("UGA"). Wood then exercised his 50% coinsurance option with NNIL and Bankers and executed a coinsurance agreement reflecting the same. No notice was given to Altshuler of Wood's exercise of his option.

Wood continued to write business for NNIL and Bankers through UGA and reinsured a portion of the business through UGIC. In December 1982, Jensen purchased 50% of Wood's interest in UGA for $699,000 and acquired an option to purchase 50% of the outstanding stock of UGIC. Jensen exercised his option and purchased 50% of the outstanding stock in UGIC in or around September 1983, for $125,000.

In December 1983, UGIC offered, through a private placement, 36.5% of its outstanding stock to thirteen of its key agents. This placement generated approximately $2.9 million in revenues. In or around September 1984, the stockholders of UGIC exchanged their stock in UGIC for stock in United Group Companies, Inc. ("UGC"), so that UGIC became a wholly owned subsidiary of UGC. In 1984 and 1985, UGIC paid dividends of $250,000 and $1,225,000 respectively to its parent company, UGC. United Group Association ("Association"), f/k/a United Group Trade Association, was formed in or around August 1984. In or around September 1984, UGA was reorganized so that Association became the successor to UGA (Wood's agency force).

In March 1985, Wood sold his remaining interest in UGIC, Association, and UGA to Jensen for $4,500,000. Then Jensen, in or around June 1985, merged UGIC into United Insurance Companies, Inc. ("UIC") f/k/a UGC. A public offering was made by UIC in March 1986. In January 1988, the stock was traded over-the-counter at a total market value in excess of $10,000,000.

After consolidation of the various actions, the specific causes of action asserted against the appellees can be summarized as follows:

A. Wood—breach of agency contracts, breach of agreement to assign, breach of the 50/25 coinsurance agreement, breach of fiduciary duty, fraud, civil conspiracy, and unjust enrichment.

B. NNIL and Bankers—breach of agreement to assign, breach of the 75/25 coinsurance agreement, tortious interference with contracts and business relations, breach of fiduciary duty, fraud, civil conspiracy, and unjust enrichment.

C. Jensen—tortious interference with contracts and business relationships, breach of fiduciary duty, fraud, civil conspiracy, and unjust enrichment.

D. The United Group entities—same as those against Jensen, above.

Separate motions for summary judgment were filed by: Wood; Bankers United, NNIL, and Jensen; and the United Group

Entities. A response to each motion was made by Altshuler, Republic Bankers, and American Reserve. All motions were granted, resulting in a take-nothing judgment against all appellants.

In a summary judgment case, the issue on appeal is whether the movant met his burden for summary judgment by establishing that there exists no genuine issue of material fact and that he is entitled to judgment as a matter of law. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex.1979); TEX.R.CIV.P. 166a. The burden of proof is on the movant, and all doubts as to the existence of a genuine issue as to a material fact are resolved against him. *Great American R. Ins. Co. v. San Antonio Pl. Sup. Co.*, 391 S.W.2d 41, 47 (Tex.1965). Therefore, we must view the evidence in the light most favorable to the nonmovant. *See id.* In deciding whether there is a material fact issue precluding summary judgment, all conflicts in the evidence will be disregarded and the evidence favorable to the nonmovant will be accepted as true. *Montgomery v. Kennedy*, 669 S.W.2d 309, 311 (Tex. 1984); *Farley v. Prudential Ins. Co.*, 480 S.W.2d 176, 178 (Tex.1972). Every reasonable inference from the evidence must be indulged in favor of the nonmovant and any doubts resolved in his favor. *Montgomery*, 669 S.W.2d at 311. Evidence which favors the movant's position will not be considered unless it is uncontroverted. *Great American*, 391 S.W.2d at 47.

■ Appellants' second and third points of error are generally applicable to all appellees. These points attack the action of the trial court in permitting the deposition of Altshuler to be filed after the rendition of judgment. It is claimed that the deposition could not be considered as part of the summary judgment proof because of its untimely inclusion in the record. Hearings on the summary judgment motions of NNIL, Bankers, and Wood were held on September 18 and October 16, 1987. On November 30, 1987, the trial court notified the parties by letter that it granted the motions of Wood, Bankers, and NNIL. On April 15, 1988, the court heard the motion

for summary judgment filed by the United Group entities. On May 26, 1988, Bankers and NNIL filed a motion for leave to file Altshuler's deposition, pointing out that all parties and the court had produced, used, cited to, and quoted from the deposition at the hearings in the belief that the deposition was on file but that the deposition could not be located in the clerk's file. On August 5, 1988, the trial court granted leave to file the deposition in an order, stating that the deposition and exhibits thereto were considered by the court in granting the motions for summary judgment of Bankers and NNIL. Judgment was signed on August 12, 1988.

TEX.R.CIV.P. 166a(c) permits filing summary judgment proof after the hearing "and before judgment with permission of the court." *Id.*

Appellants contend the rule refers to the rendering of judgment as opposed to the entering of judgment, and that the signing of the judgment constituted entering the judgment which had been rendered by the court's announcement of its decision prior to the filing of Altshuler's deposition. Appellees counter by pointing to TEX.R. CIV.P. 166a(e) wherein it is provided in part: "defects in form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend." *Id.* They claim that the essence of appellants' complaint is the trial court considering evidence not properly before it at the hearings. It follows, they claim, appellants' failure to object to such evidence on the ground that it was part of a deposition not on file deprived appellees of the opportunity to cure by simply filing the deposition. In *Life Ins. Co. v. Gar–Dal, Inc.*, 570 S.W.2d 378 (Tex. 1978), the summary judgment was upheld against the claim that a copy of the note sued upon was not properly authenticated in the affidavit in support of the motion so that the summary judgment proof was inadequate. Although our supreme court held that the photocopy of the note was proper evidence, it wrote:

Furthermore, defendants waived their right to complain of the alleged defect in

the form of plaintiff's proof by failure to except to the motion for summary judgment or the affidavit accompanying same prior to entry of the judgment. *Youngstown Sheet & Tube Co. v. Penn, supra* [363 S.W.2d 230 (Tex.1962)]; *Roland v. McCullough*, 561 S.W.2d 207 (Tex.Civ. App.—San Antonio 1977, writ ref'd n.r. e.). These alleged defects were matters of form that might easily have been cured if they had been timely pointed out in the response to the motion for summary judgment. Although the trial court still had jurisdiction on November 1, 1976, and thus the discretion to set aside the judgment, it did not abuse its discretion in refusing to do so. We conclude that the better rule is that defects of form are waived if not pointed out to the trial court before summary judgment is rendered. *See: Jones v. McSpedden*, 560 S.W.2d 177 (Tex.Civ.App.—Dallas 1977, no writ).

*Id.* at 380–81. There are additional circumstances worth consideration in the case before us. Each appellant also cited, quoted, and relied upon excerpts from Altshuler's deposition in their responses to all motions for summary judgment. It was only after appellees discovered that the court clerk could not locate the deposition and requested leave to belatedly file a copy with the clerk, that appellants objected. Under the facts of this case we hold it was not error for the court to consider the deposition as summary judgment proof or to allow its belated filing. Furthermore, appellants waived their right to complain of the alleged defect in the form of appellees' proof by failing to object on such ground, with opportunity for appellees to amend under rule 166a(e). Points of error two and three are overruled.

We now consider the motions for summary judgment in the order of their filing.

### BANKERS AND NNIL

Bankers and NNIL based their motion on the grounds that the basic claims against them assert rights of a contractual nature that are not enforceable, and the remaining claims against them, "while cast in language sounding in tort, are an indirect attempt to recover for the breach of an unenforceable agreement." They first refer to the assignment by Wood to Altshuler of an option to coinsure 25% of the business written by Wood in states outside of Texas and Oklahoma, which option was acknowledged in McCartan's letter of May 22, 1981. They then refer to testimony of Altshuler that he never requested Wood to exercise his option with Bankers and NNIL, nor did Republic ever exercise its option with Wood within the three-year period. The failure of Republic to exercise its option, they argue, was a relinquishment of its rights. This position is not tenable, however, because appellants' cause of action against Bankers and NNIL is for tortious interference with their business and contractual relations with Wood, based upon the refusal to provide the information regarding the business coinsured by Wood necessary for them to decide whether to exercise the option to participate with Wood in that business. Appellants' suit is not to enforce the 50/25 contract against Bankers and NNIL, nor for damages resulting from their breach of that contract. Consequently, the fact that the option was not timely exercised is not a defense as a matter of law to the cause of action pled by appellants in this regard.

Bankers and NNIL also claim, in their motion for summary judgment, that their agreement to permit coinsurance of 75% of the business written for them in Texas and Oklahoma is an oral agreement and thus, its enforcement is barred by the Statute of Frauds. Appellants counter by saying the written memorandum prepared by McCartan coupled with other letters and documents evidencing the essential terms of the agreement constitute sufficient memoranda to satisfy the Statute of Frauds. A valid memoranda of a contract may consist of letters, telegrams, and other documents signed by the party to be charged, which when read in conjunction, form the basis of the contract. *American Bank v. Thompson*, 660 S.W.2d 831 (Tex. App.—Waco 1983, writ ref'd n.r.e.); *Central Power & Light Co. v. Del Mar Conserv. Dist.*, 594 S.W.2d 782 (Tex.Civ.App.—

San Antonio 1980, writ ref'd n.r.e.). The writing is not required to contain all stipulations between the parties, but only the essential terms of the contract. *Osborne v. Moore*, 112 Tex. 361, 247 S.W. 498 (1923). Furthermore, the agreement under which the parties operated provided for termination upon a number of eventualities, any of which could have happened within one year. If performance within a year is a possibility that is consistent with the provisions of the agreement, the fact that performance within one year is not required or expected would not bring the contract within the Statute of Frauds. *Mercer v. C.A. Roberts Co.*, 570 F.2d 1232 (5th Cir.1978); *Hardin Assoc., Inc. v. Brummett*, 613 S.W.2d 4 (Tex.Civ.App.—Texarkana 1980, no writ); *Eisenbeck v. Buttgen*, 450 S.W.2d 696 (Tex.Civ.App.—Dallas 1970, no writ). Finally, appellants have pled facts alternatively under the doctrine of promissory estoppel, which, if true, preclude summary judgment based upon the Statute of Frauds. *See "Moore" Burger, Inc. v. Phillips Petroleum Co.*, 492 S.W.2d 934 (Tex. 1972).

■ We next consider the contention that appellants' tort claims "fail as a matter of law" because they are simply indirect attempts to recover damages for breach of unenforceable agreements. There is authority for the proposition that one who seeks to recover what he would have gained had an unenforceable promise been kept, even though his pleadings sound in tort, cannot recover. *See Webber v. M.W. Kellogg Co.*, 720 S.W.2d 124 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). Appellants responded in the trial court that their tort claims were independent causes of action, separate from a cause of action for breach of their coinsurance contracts with Bankers and NNIL and with Wood. They point to their allegations of: tortious interference with their general agent's contract with Wood; allegations of breach of fiduciary duties; allegations of conspiracy to deprive them of their agency force; and allegations of conspiracy to deprive them of proprietary information. Damages sought for those alleged torts include: damages for loss of a substantial portion of agency force; loss of proprietary information; loss of business Wood's agency would have written directly for Republic and American had Bankers and NNIL not interfered with Wood's exclusive agency contract; and loss of debit balances from delay in calling accounts due. Those alleged damages are not connected with benefits Republic and American would have received had the coinsurance agreements been fulfilled, consequently the rule in *Webber* is not applicable.

■ A defendant who moves for summary judgment on the basis of an affirmative defense must establish the defense as a matter of law. *Munoz v. Gulf Oil Co.*, 693 S.W.2d 372 (Tex.1984) (per curiam). A defendant may also prevail as movant for summary judgment if it is established, as a matter of law, that there exists no genuine issue of material fact as to one or more elements of the plaintiff's cause or causes of action. *Gray v. Bertrand*, 723 S.W.2d 957 (Tex.1987) (per curiam). In *Gibbs v. General Motors Corp.*, 450 S.W.2d 827 (Tex.1970), the Texas Supreme Court stated:

> [T]he question on appeal, as well as in the trial court, is *not* whether the summary judgment proof *raises fact issues* with reference to the essential elements of a plaintiff's claim or cause of action, *but is whether the summary judgment proof establishes as a matter of law that there is no genuine issue of fact* as to any one or more of the essential elements of the plaintiff's cause of action.

*Id.* at 828 (emphasis added). In view of the foregoing, we hold that Bankers and NNIL have not met their burden of either establishing an affirmative defense as a matter of law or that there is no genuine issue of fact as to any one or more of the essential elements of appellants' causes of action, and appellants' first point of error is sustained as to them.

## WOOD

■ In his motion for summary judgment, Wood refers to Altshuler's deposition testimony that a reinsurance contract is a "fairly complex document covering many

different subject matters" and he had never operated under a reinsurance agreement from year to year, unless in writing. Further reference is made to Altshuler's testimony that he and Wood had never discussed the various points to be contained in the contemplated coinsurance agreement, that no "formalized" agreement was prepared, and he had not signed such an agreement. Finally, Wood refers to Altshuler's admission that the usual coinsurance agreement included some eighteen features which are not contained in Wood's letter agreement. Wood then concludes that his letter agreement with Altshuler "was too incomplete, vague, indefinite and uncertain to be enforced."

Appellants' response in the trial court was that the 50/25 letter agreement does not contemplate a new, separate coinsurance agreement directly with Wood but is simply a promise to assign 50% of Wood's coinsurance agreement with Bankers and NNIL or 50% of Wood's profits of the asset shares of the business. Considering the circumstances under which Wood wrote, and the contents of his letter, we cannot say he has demonstrated his promises to be unenforceable as a matter of law.

■ Wood's motion then contends that even though the 50/25 agreement is enforceable, appellants could have suffered no damages for its breach, because it is undisputed that "the block of business which was to be coinsured resulted in a severe economic loss." The only proof submitted in this regard is the following portion of Wood's affidavit:

> My prior company, United Group Insurance Company, was required to place in escrow the sum of $1,000,000.00 as security for its obligations under the reinsurance agreement which it ultimately reached with certain of the other Defendants. United Group Insurance Company terminated the coinsurance agreement in May of 1982 for reason that we had posted an approximately $13,000,-000.00 statutory loss.

Appellants countered with Altshuler's testimony to the effect that statutory accounting in the insurance business does not necessarily reflect true profit or loss, because the business itself has value and blocks of business are commonly sold between companies for an amount of from six to nine months of the block's policy premiums regardless of the business' posting of an operating loss. Offered also is a memorandum generated in the office of Tom McCartan in 1982, describing this block of business as "a very important part of the NN Investors' premium flow." We conclude that Wood has not established as a matter of law that no damages could have arisen from a breach of the 50/25 agreement.

■ The next contention urged in Wood's motion is that "Plaintiffs have admitted that Wood's business caused Plaintiffs to lose money," therefore, "as a matter of law Plaintiffs have not been damaged, even if Wood did breach his agency contract." No summary judgment proof is referred to in substantiation of this contention, but the following language in appellants' petition is the alleged admission relied upon by Wood: "Plaintiffs have continued to pay renewal commissions under said agency agreements by offsetting the same against debit balances due Plaintiffs thereunder." If, in fact, Wood owed money to appellants when he terminated the agency contract, that fact does not establish as a matter of law the absence of profitability of the agency to appellants.

■ The next contention made in Wood's motion is that appellants never exercised their option to enter into the 50/25 reinsurance agreement, relying on Altshuler's deposition testimony admitting he never exercised that option. Appellants' pleadings included the allegation that in December 1983 Altshuler requested information regarding the business written by Wood which Republic had the right to reinsure and "Defendants refused to provide such information and denied the existence of Plaintiffs' right to coinsure any of said business," thus breaching the 50/25 agreement. Testimony in support of those pleadings appears in Altshuler's deposition and was pointed out in appellants' response. In the light of appellants' pleadings and summary judgment proof, it can-

not be said Wood has established as a matter of law that failure to exercise the 50/25 agreement option defeats appellants' cause of action based on that agreement. *See Jones v. Gibbs*, 133 Tex. 627, 130 S.W.2d 265 (1939); *Colligan v. Smith*, 366 S.W.2d 816 (Tex.Civ.App.—Fort Worth 1963, writ ref'd n.r.e.).

Wood's motion also contended that he is entitled to a partial summary judgment against Altshuler individually because Altshuler admitted he had no individual claim against Wood. He provided proof from Altshuler's deposition to the effect that McCartan's 75/25 letter agreement gave him no individual rights, since it dealt with coinsurance which can only be provided by an insurance company. On the other hand, appellants' response offered proof from the same deposition that Altshuler was asserting an individual cause of action against Wood based upon Wood's promise to pay Altshuler 25% of certain profits referred to in the 50/25 letter agreement. Wood's contention in this regard is also untenable.

Wood's next contention was that appellants' claim for breach of fiduciary relationship must fail because his agency contract with Republic and American designated his relationship with appellants as that of an "Independent Contractor only." He urged that a finding of a fiduciary duty requires the existence of a confidential relationship between the parties. It follows, he reasoned, that an independent contractor deals at arms length and cannot have a confidential relationship, citing *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, 769, *cert. denied*, 358 U.S. 898, 79 S.Ct. 223, 3 L.Ed.2d 148 (1958). We do not find that case supports Wood's position. In *Hyde* the Texas Supreme Court found a confidential relationship to exist between a licensor and licensee as a matter of law. In discussing liability for breach of confidence, the court wrote: "The chief example of a confidential relationship under this rule is the relationship of principal and agent (see Restatement of Agency secs. 395 and 396)." *Id.*

An agent is one who consents to act on behalf of and subject to the control of another, the principal, who has manifested consent that the agent shall so act. The relationship between agent and principal is a fiduciary relationship. *West v. Touchstone*, 620 S.W.2d 687, 690 (Tex. Civ.App.—Dallas 1981, writ ref'd n.r.e.); RESTATEMENT (SECOND) OF AGENCY sec. 1 (1958). The contract in question is headed "General Agent's Contract" and clearly states that Wood "is hereby appointed General Agent of CO." The language referred to by Wood could be construed as simply eliminating any possible employer-employee relationship without intending to negate the duty of confidentiality otherwise inherent in an agency relationship, especially in view of the following language of the same paragraph:

> Kieth [sic] Wood ... agrees to devote his time on a full and exclusive basis to the sale of the policies and supervision of the agents and representatives as shall be required for the successful promotion of CO's business in accordance with this contract.

We hold that Wood has not demonstrated that as a matter of law there was no confidential or fiduciary relationship between the parties.

In urging summary judgment as to appellants' cause of action for fraud, Wood's sole argument is based upon the contention that a showing of damages to appellants is not possible because they "have consistently maintained that the Wood agency operated at a loss and caused the Plaintiffs to lose money." No additional summary judgment proof is offered. We have previously considered that contention and have found it to be without merit.

Wood's final contention was that appellants' claims of unjust enrichment must fail because such claim is in equity, whereas appellants were asserting the existence of contracts, thus barring the right to recover in equity. He further stated that unjust enrichment can only be awarded for "benefits received" unjustly, and since the Wood agencies operated at a loss there could be no benefits received. Appel-

lants responded that even though their pleadings asserted the existence of contracts, they were allowed to plead in the alternative for equitable relief in the event a jury should find no contract came into existence. As to the contention that no benefits were received, appellants point to the proof of Jensen purchasing one-half of Wood's agency in 1982 for $700,000 and, two years later, purchasing the remaining one-half of the agency and Wood's insurance company which had coinsured the business in question for $4,000,000. This portion of Wood's motion must also fail, because it does not establish as a matter of law that appellants' cause of action based upon unjust enrichment cannot be sustained. From what we have said, we must hold that Wood has failed to carry his burden of showing his entitlement to the summary judgment awarded him. Appellants' first point of error is sustained as to Wood.

UNITED INSURANCE COMPANIES, INC., UNITED GROUP ASSOCIATION, UNITED GROUP AGENCIES, INC., AND RONALD JENSEN

As grounds for summary judgment in their favor, these appellees presented the arguments that appellants' were barred from recovery as a matter of law by the Statute of Frauds, appellants' failure to exercise their option, and their demonstrated lack of damages. Because their arguments and authorities were almost identical with those of the other appellees previously discussed, we will not further address those issues, but for all of the reasons previously stated, we hold that these appellees did not demonstrate as a matter of law that appellants' causes of action against them cannot be sustained.

The judgment is reversed and the cause is remanded for trial.