**ROYAL MORTGAGE CORPORATION,**
Appellant,

v.

**F. Douglas MONTAGUE III; Frank D. Montague Jr.; Mary Dixon Montague; Montague, Pittman and Varnado, A Professional Corporation; MR–1, L.L.C.; CM & M Ltd.; Bobby L. Chain; and Michael McElroy.**

No. 2–99–329–CV.

Court of Appeals of Texas, Fort Worth.

Jan. 18, 2001.

Rehearing Overruled April 5, 2001.

Law Office of Timothy G. Chovanec and Timothy G. Chovanec, Fielding, Parker & Jones, David Fielding and Nathan Schattman, Fort Worth, for Appellant.

Bourland, Kirkman, Seidler & Evans, David L. Evans, James V. Jay, and Thomas M. Michel, Fort Worth, Thompson, Coe, Cousins & Irons, Alison H. Moore, Wade Crosnoe, and Jacquelyn Chandler, Dallas, for Appellee.

Panel A: DAY, J.; DAVID F. FARRIS, J. (Retired, Sitting by Assignment); and DAVID L. RICHARDS, J. (Sitting by Assignment).

## OPINION

DAVID L. RICHARDS, Justice (Assigned).

### INTRODUCTION

Royal Mortgage Company ("Royal") brought suit against seventeen named defendants, asserting causes of action for negligence, breach of contract, breach of fiduciary duty, fraud, and DTPA violations arising out of a transaction for the sale of debt instruments called the Park Cities Properties Package ("Park Cities"). Appellees include eight Mississippi residents and companies who were dismissed from the suit after the trial court sustained their special appearance motions.

### FACTUAL BACKGROUND

Mortgage Resources, Inc. ("Mortgage Resources") is a Mississippi corporation formed to purchase debt instruments from Royal and other loan servicing businesses. F. Douglas Montague III is Mortgage Resources' sole officer and shareholder.

In 1994, Mortgage Resources contracted with Kevin Edlin to bid, service, and collect on loan packages for Mortgage Resources. In exchange, Edlin would receive a 16% commission on the gross proceeds, collected as administrative costs, and an additional 42.5% of proceeds collected after deduction of administrative costs and the return of the principal payment to investors. Mortgage Resources would retain a 15% commission, collected after deduction of administrative costs. The contract was signed by Douglas Montague as president of Mortgage Resources and identified Edlin as an independent contractor.

Subsequently, MR–1, L.L.C. ("MR–1") and CM & M, Ltd. ("CM & M") were formed under the laws of Mississippi to take ownership of assets purchased by Mortgage Resources. Douglas Montague served as president of MR–1 and managing partner of CM & M. The original shareholders in MR–1 also included Mary Dixon Montague and H. Dixon Montague. By amendment of MR–1's shareholder agreement, Michael McElroy became a member of MR–1 in October 1995.[1] Bobby L. Chain and Frank D. Montague, Jr. were general partners in CM & M.

In October 1995, Mortgage Resources entered into an "Agency Agreement" with MR–1, which identified Mortgage Resources as "agent" for the purpose of reviewing prospective mortgage and debt instruments, obtaining ownership of selected debt instruments, and collecting funds payable from them. The agreement also recited that Mortgage Resources would "act" as an independent contractor, identifying Edlin as an independent contractor of Mortgage Resources and memorializing the terms upon which Edlin would be compensated through Mortgage Resources.

A separate agreement was also reached between CM & M and Mortgage Resources.[2] Mortgage Resources was to receive a 5% commission of sums collected as a management fee on the mortgages it purchased. CM & M contracted directly with Edlin to collect from the mortgages of specific properties in exchange for a 10% commission on the sums collected. Profits

---

1. The amendment recites that MR–1 had previously purchased the Park Cities Properties Package. Each member would own a fractional interest in the company.

2. The agreement itself is not a part of this record; however, the terms of the agreement are memorialized in the CM & M partnership agreement.

were to be paid out of CM & M after deducting the 5% management fee paid to Douglas Montague and the 10% collection fee paid to Edlin.[3]

Royal is a Texas corporation with its principal place of business in Arlington, Texas. Royal purchases debt instruments from third parties. In May 1997, Royal purchased the Park Cities package of debt instruments from Mortgage Resources for between $1.5 and $1.7 million after negotiating the terms of the sale with Edlin. The agreement was signed by Douglas Montague as Mortgage Resources' president. Several months after the transaction, Royal contacted Douglas Montague claiming that assets had not been transferred.

### Procedural Background

Royal filed suit in April 1999, against Douglas Montague, Mortgage Resources, Edlin, MR–1, and CM & M, in addition to the MR–1 individual shareholders and the CM & M general partners. Royal also filed suit against the Mississippi law firm of Montague, Pittman, and Varnado, P.C. ("Montague Law Firm"), which Royal claimed represented it during the Park Cities sale. Royal alleged that the defendants or their agents either intentionally or negligently made false representations about the value of Park Cities and failed to disclose that Edlin had a prior felony background. Royal further alleged that each of the corporate defendants was organized and operated as a mere tool or business conduit of the individual defendants who received the direct benefit of the Park Cities sale.

Except for Edlin and Mortgage Resources, each of the appellees filed a separate special appearance challenging the trial court's exercise of jurisdiction. Royal filed a written motion for continuance claiming it needed time for additional discovery. On September 10, 1999, the trial court heard the motions.

In their joint brief supporting their special appearances, appellees argued that their only contact with Texas was through Edlin, an independent contractor, and that Royal's suit was based entirely on Edlin's actions. Appellees explained that in the fall of 1996, it was determined that all assets owned by MR–1 and CM & M would be sold in bulk and that Edlin, working for Mortgage Resources, would locate a buyer and negotiate the terms of the sale on behalf of the owning entities. In May 1997, Edlin advised Douglas Montague that he had entered into negotiations on behalf of Mortgage Resources to sell the assets of MR–1 and CM & M to an initially undisclosed buyer. Immediately prior to consummating the transaction, Edlin disclosed that Royal was the buyer. Appellees claimed that this was the first time that Douglas Montague had any knowledge that Edlin was negotiating on behalf of Mortgage Resources with Royal. The purchase agreement for Park Cities was executed in Mississippi by Douglas Montague as Mortgage Resources' president.

In support of their special appearances, Douglas Montague testified by affidavit that he exercised control over MR–1 and CM & M at all relevant times and that Mortgage Resources, MR–1, and CM & M maintained separate accounts from any other person or entity. He claimed that Mortgage Resources was charged with negotiating and consummating the sale of MR–1's and CM & M's assets and that

---

**3.** The agreement between CM & M and Edlin is memorialized as a separate clause in CM & M's partnership agreement.

Edlin, acting on behalf of Mortgage Resources, entered into negotiations to sell MR–1's assets to Royal. He testified that other than requesting the bulk sale of the assets managed by Mortgage Resources, he had no role in the negotiation or consummation of the sale agreement. He further stated that Edlin was the only party who had any communications with Royal during the negotiations and that Edlin did not disclose Royal's identity to him until the Purchase Agreement was executed.

Royal alleged in its jurisdictional brief that Mortgage Resources and Edlin were acting as agents for MR–1 and CM & M. Royal also submitted as evidence the affidavits of Clay Chancellor and Edlin.

Chancellor testified by affidavit that he was a partner in MR–1. He claimed that MR–1 and CM & M were joint venturers in Texas with Mortgage Resources and claimed that Mortgage Resources maintained an office in Athens, Texas and sold Park Cities through that office. Chancellor also claimed that Douglas Montague directed the transfer of funds in the transaction with Royal and that the Montague Law Firm directed Edlin's activities in the initial purchase of Park Cities prior to Royal's involvement.

Edlin claimed in his affidavit that he operated out of his office in Athens, Texas and that he conducted business for Mortgage Resources out of that office. Edlin also claimed that Mortgage Resources directed him through Douglas Montague to conduct business activities in Texas, including the sale of Park Cities, and that Royal was instructed to transfer the sale proceeds to an Athens bank account held in the name of Kevin Edlin, d/b/a/ Mortgage Resources. Edlin further related that Douglas Montague directed him to wire all of the proceeds from the Park Cities sale to Mortgage Resources and CM & M, but Edlin withheld his commission.

After examining the pleadings, evidence, and argument on both sides, the trial court sustained the appellees' special appearances, denied Royal's motion for continuance, and dismissed the appellees from the case. Royal requested findings of fact and conclusions of law, which were entered by the trial court. The trial court found that Royal's claims centered around the sale of assets by Mortgage Resources through Edlin, its independent contractor; that appellees did not contract with a Texas resident or own property in Texas; and that appellees had not purposefully established minimum contacts with Texas. Based on these findings, the trial court concluded that it did not have specific or general jurisdiction and that jurisdiction over Mortgage Resources and Edlin could not be imputed to appellees. Royal timely filed its notice of interlocutory appeal.

## COMPLAINTS ON APPEAL

On appeal, Royal challenges the factual sufficiency of the evidence to support the trial court's findings of fact and conclusions of law as to each of the appellees. Royal also complains the trial court abused its discretion in denying its motion for continuance because additional jurisdictional discovery was required.

## PERSONAL JURISDICTION

### Standard of Review

Texas Rule of Civil Procedure 120a allows a nonresident defendant to contest the trial court's exercise of personal jurisdiction by making a special appearance. The trial court determines the special appearance by referring to the pleadings, any stipulations made between the parties, affidavits and attachments filed by the parties, discovery, and oral testimony. TEX. R.CIV.P. 120a(3). The plaintiff or the defendant may bring an interlocutory appeal

from the outcome of the defendant's special appearance. Tex.Civ.Prac. & Rem.Code Ann. § 51.014(a)(7) (Vernon Supp.2001).

When a defendant challenges a trial court's exercise of jurisdiction through a special appearance, he carries the burden of negating all bases of personal jurisdiction. *Kawasaki Steel Corp. v. Middleton,* 699 S.W.2d 199, 203 (Tex.1985); *Fish v. Tandy Corp.,* 948 S.W.2d 886, 891 (Tex.App.—Fort Worth 1997, writ denied); *Nikolai v. Strate,* 922 S.W.2d 229, 236 (Tex.App.—Fort Worth 1996, writ denied). If the trial court makes findings of fact, they are binding on this court unless challenged on appeal. *Mort Keshin & Co. v. Houston Chronicle Pub. Co.,* 992 S.W.2d 642, 645 (Tex.App.—Houston [14th Dist.] 1999, no pet.). Where the trial court's findings are challenged, we review the evidence for factual sufficiency. *Nikolai,* 922 S.W.2d at 236. In doing so, we must consider all of the evidence on the jurisdictional question, both the evidence that tends to support the existence of a vital fact as well as evidence that tends to disprove its existence. *Fish,* 948 S.W.2d at 892; *Nikolai,* 922 S.W.2d at 236. In considering the evidence, if a finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust, the point should be sustained, regardless of whether there is some evidence to support it. *Fish,* 948 S.W.2d at 892. We review the trial court's conclusions of law de novo. *See id.; Nikolai,* 922 S.W.2d at 236.

*Due Process & Texas Long–Arm Statute*

A court may assert personal jurisdiction over a nonresident defendant only if the requirements of both the Due Process Clause of the Fourteenth Amendment to the United States Constitution and the Texas long-arm statute are satisfied. Tex. Civ.Prac. & Rem.Code Ann. §§ 17.041–.069 (Vernon 1997); *Schlobohm v. Schapiro,* 784 S.W.2d 355, 356 (Tex.1990). The Texas long-arm statute has been construed to reach as far as the limits the Due Process Clause allows. *Schlobohm,* 784 S.W.2d at 357; *U-Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978). Therefore, the requirements of the Texas long-arm statute are satisfied if the exercise of personal jurisdiction comports with federal due process requirements. *See Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 226 (Tex.1991).

A defendant's contacts with the forum can give rise to either general or specific jurisdiction. General jurisdiction is present when a defendant's contacts are continuous and systematic, permitting the forum to exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities within the forum state. *See Schlobohm,* 784 S.W.2d at 357. In contrast, specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum state. *See id.* On appeal, Royal only contends that MR–1 and CM & M have sufficient contacts to satisfy specific jurisdiction.

Texas has promulgated its own formula for specific jurisdiction to ensure compliance with both the federal and state constitutional standards. First, the nonresident defendant must purposefully establish minimum contacts with Texas such that there is a substantial connection between the nonresident defendant and Texas arising from the action or conduct of the defendant. Second, the exercise of jurisdiction must comport with traditional notions of fair play and substantial justice. *See id.* at 358. When applying the jurisdictional formula to a particular case, how-

ever, we must weigh the facts carefully and avoid any mechanical application of the test. *See id.*

Under the minimum contacts test, a nonresident defendant that has purposefully availed itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction. *CSR Ltd. v. Link,* 925 S.W.2d 591, 594 (Tex.1996). The purposeful availment requirement ensures that the nonresident will not be haled into a jurisdiction based solely upon random, fortuitous, or attenuated contacts, or the unilateral activity of the plaintiff or a third party. *Guardian Royal,* 815 S.W.2d at 226. It is not the number, but the quality and nature of the nonresident defendant's contacts with the forum that is important. *Memorial Hosp. Sys. v. Fisher Ins. Agency, Inc.,* 835 S.W.2d 645, 648 (Tex.App.—Houston [14th Dist.] 1992, no writ) (op. on reh'g). There must be a substantial connection with the nonresident defendant and Texas that arises from the defendant's action or conduct purposefully directed toward Texas. *See id.*

Even a single act can support jurisdiction, so long as it is substantial. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 n. 18, 105 S.Ct. 2174, 2184 n. 18, 85 L.Ed.2d 528 (1985). When determining whether a nonresident defendant has purposefully established minimum contacts, foreseeability is an important factor. *Cartlidge v. Hernandez,* 9 S.W.3d 341, 348 (Tex.App.—Houston [14th Dist.] 1999, no pet.). If a tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum, it must reasonably anticipate being haled into court there to answer for its actions. *Memorial Hosp.,* 835 S.W.2d at 650 (holding single fraudulent telephone call sufficient to establish minimum contacts).

In determining whether the assumption of personal jurisdiction comports with traditional notions of "fair play and substantial justice," we consider the contacts in light of other factors. These factors include:

(1) the burden on the defendant;

(2) the interest of the forum state in adjudicating the dispute;

(3) the plaintiff's interest in obtaining convenient and effective relief;

(4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and

(5) the shared interest of the several states in furthering fundamental substantive social policies.

*Burger King,* 471 U.S. at 476–77, 105 S.Ct. at 2184.

Once it has been determined that the nonresident defendant has purposefully established minimum contacts with the forum state, only in rare cases will the exercise of jurisdiction not comport with fair play and substantial justice. *Guardian Royal Exch.,* 815 S.W.2d at 231. Because the minimum contacts analysis encompasses so many considerations of fairness, it is unlikely that the exercise of jurisdiction will violate traditional notions of fair play and substantial justice. *Schlobohm,* 784 S.W.2d at 357–58; *Nikolai,* 922 S.W.2d at 239. We should ask if, despite the existence of minimum contacts, there is any reason why our assertion of personal jurisdiction would offend traditional notions of fair play and substantial justice. *Schlobohm,* 784 S.W.2d at 359.

*MR–1 and CM & M*

In its first two points, the gravamen of Royal's complaint is that Edlin and Mortgage Resources were both agents of MR–1 and CM & M doing business in Texas.

Consequently, Royal contends that because Edlin conducted substantial activities for MR–1 and CM & M in Texas, the trial court's finding that MR–1 and CM & M did not establish purposeful contacts in Texas is manifestly unjust and its conclusion that it had no personal jurisdiction over MR–1 and CM & M is erroneous. MR–1 and CM & M respond that the agency agreement executed with Mortgage Resources was simply a contract between Mississippi corporations and that Edlin's contacts with Texas as an independent contractor of Mortgage Resources do not subject them to the jurisdiction of Texas courts.

▪ MR–1 and CM & M initially respond that Royal's allegations that they "did business" in Texas is so weak that they only had to prove they were nonresidents to sustain their special appearances. *See Siskind v. Villa Found. for Educ., Inc.*, 642 S.W.2d 434, 438 (Tex.1982) (holding proof that defendant was nonresident was sufficient where plaintiff did not allege specific jurisdictional facts). However, we need not determine whether Royal's original petition alleged specific jurisdictional facts. The issue of whether MR–1 and CM & M were doing business in Texas was raised by the evidence at the special appearance hearing without objection and, accordingly, was tried by consent. *See* TEX.R.APP.P. 33 .1; *Temperature Sys., Inc. v. Bill Pepper, Inc.*, 854 S.W.2d 669, 673 (Tex.App.—Dallas 1993, writ dism'd by agr.). We overrule MR–1's and CM & M's contention that they only had to prove they were nonresidents of Texas to sustain their special appearance.

▪ Because MR–1's and CM & M's liability must arise from or relate to an activity conducted within the forum state under the minimum contacts analysis, our inquiry into whether Douglas Montague or Edlin were acting as agents for either business is limited to determining the extent of their capacity to act as agents in the sale of Park Cities. It is undisputed that Mortgage Resources signed the contract with Royal for the sale of Park Cities. We recognize that this agency inquiry requires us to impliedly determine the existence of a contract between Royal and MR–1, and Royal and CM & M, albeit through an undisclosed agent, and that the existence of a contract is an element of Royal's claims. When reaching a decision to exercise or decline jurisdiction, the merits of the cause of action are not at issue. *Memorial Hosp.*, 835 S.W.2d at 648. Nevertheless, because Royal alleged the existence of a contract between MR–1 and CM & M, the burden is on MR–1 and CM & M to disprove the existence of the contract as a contact with Texas. The fact that the existence of the contract is also an element of Royal's cause of action does not preclude us from reaching this determination. *See Ross F. Meriwether & Assoc., Inc. v. Aulbach*, 686 S.W.2d 730, 732 (Tex.App.—San Antonio 1985, no writ).

▪ In considering Royal's points on appeal, we observe the general rule of law that an agent is one who consents to the control of another, the principal, who has manifested consent that the agent shall so act. *Republic Bankers Life Ins. Co. v. Wood*, 792 S.W.2d 768, 778 (Tex.App.—Fort Worth 1990, writ denied). The relationship between agent and principal is a fiduciary relationship. RESTATEMENT (SECOND) OF AGENCY § 1 (1958). An agency relationship does not depend upon the express appointment or assent by the principal; rather, it may be implied from the conduct of the parties. *Orozco v. Sander*, 824 S.W.2d 555, 556 (Tex.1992).

▪ Agency will not be presumed, and the party asserting the relationship has the burden of proving it. *Lyons v.*

*Lindsey Morden Claims Mgmt., Inc.,* 985 S.W.2d 86, 90 (Tex.App.—El Paso 1998, no pet.); *Schultz v. Rural/Metro Corp.,* 956 S.W.2d 757, 760 (Tex.App.—Houston [14th Dist.] 1997, no writ). Additionally, the nonresident party bears the burden of negating all bases of personal jurisdiction in a special appearance. *See MacMorran v. Wood,* 960 S.W.2d 891, 894 (Tex.App.—El Paso 1997, pet. denied).

In an attempt to impose liability based on an agency theory, the "right to control" test is typically applied. *Smith v. Foodmaker, Inc.,* 928 S.W.2d 683, 687 (Tex.App.—Fort Worth 1996, no writ) (citing *Newspapers, Inc. v. Love,* 380 S.W.2d 582, 590–91 (Tex.1964)). Under this test, the court examines whether the alleged principal has the right to determine the details of the work. *See Smith,* 928 S.W.2d at 687. It is the extent of the principal's control over the details of accomplishing the assigned task that primarily distinguishes the status of independent contractor from that of agent. *Lyons,* 985 S.W.2d at 90.

A question of agency is generally one of fact, and a person may be an independent contractor under some circumstances yet may be an agent or employee in connection with other work or activities. *Id.; see also Robles v. Consol. Graphics, Inc.,* 965 S.W.2d 552, 558 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (op. on reh'g). The two relationships are not mutually exclusive. A party who contracts to act on behalf of another and is subject to the other's control except with respect to his physical conduct is an agent and also an independent contractor. *Robles,* 965 S.W.2d at 558.

Whether a principal-agent relationship exists under established facts may be determined as a matter of law, based on the agreement between the parties, their words, and their conduct. *Ross v. Texas One Partnership,* 796 S.W.2d 206, 210 (Tex.App.—Dallas 1990), *writ denied per curium,* 806 S.W.2d 222 (Tex.1991); *Mercedes–Benz of N. Amer., Inc. v. Dickenson,* 720 S.W.2d 844, 858 (Tex.App.—Fort Worth 1986, no writ).

We first address whether Mortgage Resources or Edlin was acting as an agent for MR–1. The trial court did not expressly find the absence of an agency relationship between Mortgage Resources, Edlin, and MR–1. It found only that Royal's claims centered around Edlin, an independent contractor of Mortgage Resources. Nevertheless, we must view the trial court's judgment as impliedly finding all the necessary facts to support its judgment if supported by the evidence. *Fish,* 948 S.W.2d at 892. Here, not only does MR–1's amended partnership agreement memorialize MR–1's original acquisition of Park Cities, but also Douglas Montague testified by affidavit that he was "charged" to sell the assets of MR–1 as president of Mortgage Resources. Moreover, the discovery on file establishes that Douglas Montague, McElroy, Mary Montague, and Frank Montague were each paid dividends from the proceeds of the Park Cities sale. Douglas Montague also stated in his affidavit that Edlin, acting on behalf of Mortgage Resources, entered into negotiations to sell the assets of MR–1 to Royal. This evidence was uncontested. While Douglas Montague denied that MR–1 had entered into any contracts in Texas, the great weight and preponderance of the evidence establishes not only that Mortgage Resources had consent to contract for the sale of Park Cities, but that Mortgage Resources entered into the contract for the benefit of MR–1.

Turning our attention to the second part of the control test, in considering the record as a whole, there is no direct evidence

of control over the work performed by Mortgage Resources under any agreement. However, to say that MR–1 did not exercise control over Mortgage Resources, the trial court would have had to ignore that Douglas Montague exercised independent control over both Mortgage Resources and MR–1. In such a position it would be virtually impossible for Royal to prove that MR–1 exercised control over the details of Mortgage Resources' work. Nevertheless, not only would Texas law impute Douglas Montague's knowledge to MR–1 in matters affecting its business interests, but also the law would impose a fiduciary duty on Douglas Montague because of his peculiar position of confidence to MR–1. *Cf. Poth v. Small, Craig, & Werkenthin, L.L.P.*, 967 S.W.2d 511, 515 (Tex.App.—Austin 1998, pet. denied) (knowledge held by corporate officers may be imputed to corporation itself); *Thomas v. American Nat'l. Bank*, 704 S.W.2d 321, 324 (Tex.1986) (notice to any partner relating to partnership affairs is notice to partnership); *Faour v. Faour*, 789 S.W.2d 620, 621 (Tex.App.—Texarkana 1990, writ. denied) (corporate officer owes fiduciary duty to corporation).[4] Both are hallmarks of an agency relationship.

■ Moreover, the trial court would have had to ignore the underlying relationship of the parties and their prior course of dealings, which demonstrate that MR–1 and CM & M were created to take ownership of selected assets acquired by Mortgage Resources and continued to sell them by agreement in exchange for a com-mission. Generally, one who is employed to make bargains and contracts between other persons in matters of trade and commerce for compensation is a type of agent called a broker. *Robles*, 965 S.W.2d at 557; *see also Magnum Corp. v. Lehman Bros. Kuhn Loeb, Inc.*, 794 F.2d 198, 200 (5th Cir.1986); *Hanover Fire Ins. Co. v. Bock Jewelry Co.*, 435 S.W.2d 909, 915 (Tex.Civ.App.—Dallas 1968, writ ref'd n.r.e.) (holding salesman authorized by wholesale jewelry firm to sell diamonds on commission basis at a minimum price and who traveled at will was "semi-independent agent"). Typical of this relationship is the absence of control by the principal over the details of the work. In contrast, a person who contracts to accomplish something or to deliver something to another, but who is not acting as a fiduciary for the other is a non-agent contractor. *Robles*, 965 S.W.2d at 558, n. 4.

Here, the evidence does not establish that Mortgage Resources simply brought the parties together, but rather, that it negotiated and consummated the sale, by agreement with MR–1, through Edlin. Because Mortgage Resources had authority to negotiate and enter into contracts and did so on MR–1's behalf, it was acting as an agent and a fiduciary, similar to a broker. *See id.*[5]

■ Our determination that Mortgage Resources was an agent of MR–1 does not equate to a determination that Edlin was an agent of MR–1. In this case, Mortgage Resources' agreement with MR–1 identified Edlin as an independent con-

---

4. Mississippi follows the general rule of agency that a corporation is bound by the knowledge acquired by, or notice given to, its officers or agents that is within the actual or apparent scope of their employment and that is in reference to a matter to which their authority extends. *Parmes v. Illinois Cent. Gulf R.R.*, 440 So.2d 261, 265 (Miss.1983); *see also Omnibank of Mantee v. United So. Bank*, 607 So.2d 76, 95 (Miss.1992) (observing "a corporation may ordinarily be taken to know what its officers know").

5. At the special appearance hearing, MR–1 and CM & M analogized Edlin's activities to that of a broker. However, as we have observed, a broker is an agent.

tractor of Mortgage Resources, and Mortgage Resources' contract with Edlin identified Edlin as an independent contractor. While such labels are evidence of the relationship the parties intended, they are not conclusive. *See Republic Bankers,* 792 S.W.2d at 778.

 Considering Edlin's relationship to MR–1, we note that a subagent is a person appointed by an agent to perform some duty or the whole of the business relating to his agency. He may be the agent of the agent or an agent of the principal depending upon the agreement creating the primary agency or upon the circumstances. *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank, Co.,* 917 S.W.2d 29, 49 (Tex.App.—Amarillo 1995), *rev'd in part on other grounds,* 974 S.W.2d 51 (Tex.1998); *Janes v. CPR Corp.,* 623 S.W.2d 733, 740 (Tex.App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.). A subagent appointed by an agent empowered to do so stands in a fiduciary relation to the principal and owes the duties, and is subject to the liabilities, of an agent to the principal, other than those dependant on a contractual relation. RESTATEMENT (SECOND) AGENCY § 5 cmt. d. Where no privity exists because the subagent was employed without authority, the subagent is responsible only to the superior agent. *See id.* cmt. b.

 Here, not only was MR–1 aware, through Douglas Montague, that Edlin would negotiate the actual contract, but also Mortgage Resources was authorized by agreement to utilize Edlin in that capacity. This evidence was not in dispute. While Edlin may have exercised control over the details of his work, he was employed to make bargains—a duty relating to Mortgage Resources' agency—with MR–1's consent. Accordingly, based on the entire record before us, we determine that the trial court's implied findings that Mortgage Resources and Edlin were not agents of MR–1 in negotiating and consummating the Park Cities sale is manifestly unjust.[6]

 Having determined that Mortgage Resources and Edlin were agents of MR–1, we consider whether MR–1 purposefully established minimum contacts with Texas. When a purchaser is defrauded by the misrepresentations of the seller's broker agent, if the seller resists recission of the contract or the buyer's recoupment of damages, the seller is regarded as having ratified the broker's conduct and is required to make restitution. *See Loma Vista Dev. Co. v. Johnson,* 142 Tex. 686, 180 S.W.2d 922, 924–25 (1944). Here, Royal's cause of action arose out of Edlin's alleged misrepresentations in Texas, and Douglas Montague failed to make restitution for MR–1 upon Royal's demand. MR–1 was aware, through Douglas Montague and its contract with Mortgage Resources, that Edlin operated in Texas. Moreover, MR–1 was aware, through Douglas Montague, that Mortgage Resources was contracting with a Texas corporation on MR–1's behalf, that the contract was negotiated entirely in Texas, and that the contract was partially performed in Texas.

Moreover, in determining how substantial MR–1's contacts with Texas are, we are less concerned with Edlin's status as an agent or contractor than we are with MR–1's acceptance of the benefits arising from its contract for the sale of Park Cit-

---

**6.** Nevertheless, even if the record established that neither Mortgage Resources nor Edlin was acting as an agent for MR–1, it is undisputed that MR–1 accepted the benefits of the Park Cities sale. One cannot accept the bene- fits of a repudiated agency without assuming the burdens imposed by the agency. *See D. Sullivan & Co. v. Ramsey,* 155 S.W. 580, 588– 89 (Tex.Civ.App.—San Antonio 1913, no writ).

ies. For example, in *CMMC,* the Texas Supreme Court held the trial court had no jurisdiction over a French company that manufactured winepresses where the Texas resident ordered a winepress from the nonresident defendant through a New York distributor. *CMMC v. Salinas,* 929 S.W.2d 435, 439–40 (Tex.1996). The evidence in that case showed that the French defendant, CMMC, did not design products for use in Texas, make any effort to market them in Texas, or take any other steps to purposefully avail itself of the Texas market. In determining whether CMMC purposefully directed itself toward Texas, such that a "substantial connection" existed between it and Texas, the court considered the contacts of the New York distributor, KLR, in marketing the winepresses in Texas. *Id.* at 436–37, 439. The court noted that KLR never contacted the Texas winery, the winery contacted KLR, and KLR made no attempts to market any of CMMC's products in Texas other than by advertisement in national publications. *Id.* at 439. The court did not consider the relationship between KLR and CMMC. Instead, the court held that CMMC's lack of contacts, coupled with KLR's lack of contacts, did not amount to even "a regular and anticipated flow of products from manufacture to distribution to retail sale." *Id.* (quoting *Asahi Metal Indus. v. Superior Court,* 480 U.S. 102, 117, 107 S.Ct. 1026, 1034–35, 94 L.Ed.2d 92 (1987) (Brennan, J., concurring in part)).

Here, unlike KLR, Edlin's substantial contacts with Texas were undisputed. By contracting through Edlin with one it knew to be a Texas resident, and by accepting the benefits of Edlin's contacts in Texas, MR–1 could reasonably anticipate and foresee being haled into a Texas court in a dispute alleging fraud in Edlin's negotiation of that contract in Texas. Therefore, we determine the trial court's finding that MR–1 lacked minimum contacts with Texas is manifestly unjust.

■■■ We must also determine whether MR–1's contacts comport with traditional notions of fair play and substantial justice. Here, the trial court found that subjecting MR–1 to the jurisdiction of a Texas court would violate its rights to due process even if Mortgage Resources and Edlin were determined to be its agents. In this case, Douglas Montague testified that it would be inconvenient and burdensome for MR–1 to defend itself in Texas because it has no representatives in the state. However, because the trial court has personal jurisdiction over Mortgage Resources, and MR–1 is represented by Douglas Montague, there would be little additional burden on Douglas Montague, as MR–1's sole officer, to appear on MR–1's behalf than that which he would bear in defending Mortgage Resources as its representative. Additionally, the greater burden here would be borne by Royal. The witnesses to the alleged misrepresentations made by Edlin are in Texas and Edlin himself remains subject to the trial court's jurisdiction in Texas. Moreover, Texas has a strong interest in resolving disputes over torts committed within its boundaries. In sum, considering these factors, as well as the sole but substantial contact MR–1 has with Texas, we can conceive of no reason why subjecting MR–1 to the jurisdiction of a Texas court would offend due process. Therefore, we sustain Royal's first point.

■■■ We must now consider whether the trial court's finding with respect to CM & M's contacts with Texas are manifestly unjust. We determine they are not. Here, the record does not establish that CM & M was an owner in Park Cities. Douglas Montague testified by affidavit that CM & M did not own any property,

real or personal, in Texas.[7] While his affidavit does establish that Mortgage Resources agreed to sell off CM & M's assets in bulk, the record does not establish that these assets were included in the Park Cities package.

Royal's proof consisted of the affidavits of Chancellor and Edlin, including a variety of attachments consisting primarily of correspondence between Douglas Montague and Edlin. This proof indicates that Park Cities was owned by more than one investor and that part of the Park Cities sale proceeds were transferred by Edlin to CM & M at Douglas Montague's direction. However, based on this evidence alone, we cannot say that the trial court's finding that Edlin was not an agent of CM & M in selling Park Cities is so contrary to the overwhelming weight of the evidence as to be manifestly unjust. Accordingly, we overrule Royal's second point.

### The Montague Law Firm

■ In its third point on appeal, Royal contends the trial court's findings that the Montague Law Firm did not have minimum contacts with Texas are manifestly unjust. Royal argues that it retained the services of the Montague Law Firm as its attorneys and that its representation of a Texas client necessarily involved contact with Texas. Consequently, Royal argues, the Montague Law Firm should be subject to specific and general jurisdiction in Texas because Douglas Montague failed to disclose irregularities in the Park Cities sale. Douglas Montague, as agent of the Montague Law Firm, acknowledged in his affidavit that the law firm represented Royal in 1998 by preparing an assignment and lis pendens on assets purchased from Mortgage Resources but denied represent-

ing Royal at any other time or doing any other business in Texas.

■ A nonresident attorney's representation of a Texas client does not, by itself, necessarily create sufficient minimum contacts with Texas to satisfy due process. *See, e.g., Myers v. Emery,* 697 S.W.2d 26, 30–31 (Tex.App.—Dallas 1985, no writ). Here, despite Royal's assertion that the Montague Law Firm's representation necessarily implied some contacts with Texas, Royal does not point to any specific contact the Montague Law Firm had with Royal in Texas. Based on Royal's broad assertion alone, we cannot say the trial court's findings that the Montague Law Firm lacked sufficient minimum contacts are manifestly unjust. We overrule Royal's third point.

### MR–1 Investors

■ In its fourth, fifth, sixth, and seventh points on appeal, Royal contends that the trial court's findings with respect to the lack of minimum contacts of Douglas Montague, Mary Montague, Frank Montague, and McElroy are manifestly unjust. Royal contends that MR–1 filed tax returns indicating that it was a partnership and not a company. Consequently, it argues that because MR–1 is subject to personal jurisdiction in Texas, and because a partner is individually liable for partnership debts, the partners of MR–1 are subject to personal jurisdiction in Texas.

Royal contends that tax returns filed by MR–1 in 1996, attached to Chancellor's affidavit, are evidence that MR–1 was a partnership. In the federal form 1065, schedule K–1, under the form heading "Partnership's name, address, and ZIP Code," MR–1 is identified as "MR1, LLC." In response to the question on the form

7. In contrast, Douglas Montague stated in his affidavit that neither he nor Mortgage Resources "owns" any property, real or personal.

asking what type of partner the individual is, the box labeled "limited liability company member" is checked with respect to each individual in MR–1. Douglas Montague's affidavit supporting the appellees' special appearance, and the discovery on file of MR–1's individual owners, which included MR–1's request for a taxpayer identification number, agreements and amendments to those agreements between individual owners, checks issued, and correspondence, all identify MR–1 as a limited liability company. We disagree with Royal's contention that the evidence clearly shows that MR–1 was acting as a partnership rather than a corporation.

■■■■ As we noted above, Douglas Montague, McElroy, Mary Montague, and Frank Montague were each paid dividends out of the sale of the Park Cities. However, as a general rule, a court may not assert personal jurisdiction over an individual based on the individual's relation to a corporation unless the corporation is the individual's alter ego. *Al Turki v. Taher*, 958 S.W.2d 258, 263 (Tex.App.—Eastland 1997, pet. denied); *Vosko v. Chase Manhattan Bank, N.A.*, 909 S.W.2d 95, 99 (Tex. App.—Houston [14th Dist.] 1995, writ denied). There is no evidence that any of these investors had any individual contacts with Texas in connection to the Park Cities purchase, nor is there evidence that MR–1 was acting as an alterego to any of the members. We overrule Royal's points four, five, six, and seven.

CONTINUANCE

In point eight, Royal contends the trial court erred in granting Chain's special appearance because it was premature. In point nine, Royal contends the trial court erroneously denied its motion for continuance. Royal briefs both points together, arguing generally that the trial court erred

in denying its motion for continuance. We will address both points together.

■■■■ The trial court has broad discretion to grant or deny continuances. *Hernandez v. Heldenfels*, 374 S.W.2d 196, 202 (Tex.1963). The trial court's denial of a continuance will not be disturbed on appeal absent a clear abuse of discretion. *Arit Int'l Corp. v. Allen*, 910 S.W.2d 166, 173 (Tex.App.—Fort Worth 1995, no writ). The record should clearly show that the trial court has disregarded a party's rights before reversing the trial court's ruling. *Id.* at 173–74.

Royal first contends that the trial court disregarded its rights by failing to review its affidavits in support of its motion for continuance. Royal points out that the trial court did not receive a copy of the affidavits until the hearing because the affidavits did not appear in the court's file, and, after being presented to the trial court, the judge remarked that she obviously had not read them yet. Our review of the hearing, however, reveals that the trial judge was presented with the affidavits after she heard the arguments of counsel based on Royal's motion. We find nothing in the record to suggest the trial court did not read the affidavits at the hearing. If there were facts which would have revealed the trial court did not read the affidavits at the hearing, no record of those facts was made for our review. Accordingly, error on that basis, if any, was not preserved. *See* TEX.R.APP.P. 33.1.

■■■■ Royal further contends that the trial court abused its discretion because its motion presented adequate grounds for granting a continuance. Rule 120a(3) of the rules of civil procedure provides that, should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present facts

essential to justify his opposition, the court may order a continuance to permit affidavits to be obtained or discovery to be had. TEX.R.CIV.P. 120a(3). Here, Royal presented the affidavits of Chancellor and Edlin alleging specific jurisdictional facts, which we have already discussed above. Neither affidavit, however, references any need for a continuance or states any reason why facts essential to justify opposition to the special appearance cannot be presented. Appellant suggests that the trial court should have given it an opportunity to cure any procedural defects before denying the continuance, but none was requested. *See* TEX.R.APP.P. 33.1. Accordingly, we cannot say the trial court abused its discretion. We overrule Royal's eighth and ninth points.

### CONCLUSION

Because we determine the trial court had personal jurisdiction over MR–1, we reverse the trial court's judgment granting MR–1's special appearance and dismissing MR–1 for want of personal jurisdiction, and we remand the suit against MR–1 for trial. Because we determine the trial court's judgment was proper as to the remaining appellees, and the trial court did not abuse its discretion in denying Royal's motion for continuance, we affirm the remainder of the trial court's judgment.