NO. 07-01-0400-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

AUGUST 29, 2002

_____

MARY ELLEN ZWANK and PHIL ZWANK,

Appellants

v.

JACKIE LYNN KEMPER d/b/a LYNN'S AUTO SALES,

Appellee

_____

FROM THE 99TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 99-505,211; HON. MACKEY HANCOCK, PRESIDING

_____

Before QUINN and JOHNSON, J.J., and BOYD, SJ.[1]

Mary and Phil Zwank (the Zwanks) appeal from a final summary judgment. Via two issues, they contend that the trial court erred in granting same in favor of Jackie Lynn Kemper (Kemper) d/b/a Lynn's Auto Sales. This is allegedly so because some evidence existed supporting each element of their respective causes of action. We affirm in part and reverse in part.

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 2002).

## *Background*[2]

Mary Zwank and her daughter, Cynthia, saw a vehicle for sale in which Cynthia expressed interest. The vehicle, a 1995 Jeep (Jeep), was parked in a supermarket parking lot and displayed a "For Sale" sign. The only information on the sign was a telephone number. Cynthia called the number and spoke with Mike Groves (Groves). Thereafter, the two women went to Groves' home to inspect the Jeep. While at the residence, they informed Groves of their interest in acquiring the vehicle. At some point during this initial visit, Groves told Mary that "[h]e'd gone over to New Mexico and acquired the vehicle . . . [and] was selling it for a dealership." He also informed them that "[h]e was working for a dealership in town."

After engaging in other conversations with Groves over the next several days, the Zwanks agreed to buy the car for $19,515.13. Groves had Mary fill out a "Buyer's Order," and instructed her to write the words "Lynn's Auto Sales" in the blank identifying the seller. Lynn's Auto Sales was Kemper's trade name. Mary Groves did so and signed the agreement as "buyer." In the signature line for the seller, the phrase "Lynn's A/S" was written. Following this was the signature of "Mike Groves" as "officer." Thereafter, Groves signed the document, identifying himself as an officer of "Lynn's A/S." Mary also delivered to him a check made payable to "Mike Groves" in the amount of $19,515.13. Finally,

---

[2]Given the applicable standard of review, we interpret the evidence of record in a light most favorable to the litigant's attempting to defeat the motion for summary judgment, *i.e.* the Zwanks. *Miller v. Galveston/Houston Diocese*, 911 S.W.2d 897, 898-99 (Tex. App.– Amarillo 1995, no writ) (requiring the court to interpret the summary judgment evidence in a light most favorable to the non-movants).

2

Groves told her the title for the Jeep would be "forthcoming shortly" because "in the State of Texas . . . the dealership had to send [the title] in . . . [and] you had to wait a few days and get it that way."

On the same day of the sale, Groves deposited the check received from Mary into the account of "Direct Auto." Prior to the deposit, the balance of the account was $4,445.87. Upon depositing the check, Groves wrote two checks for $14,200 and $6,620, respectively, and made them payable Lubbock National Bank (LNB).[3] The checks were then used to acquire two cashier's checks of equal amount from LNB made payable to "Lynn's Auto." Kemper admitted to receiving the funds related to each of the two cashier's checks.

Approximately a month later, Groves contacted John Mattox (Mattox) of Wholesale Auto Center (Wholesale) and asked if Wholesale would be interested in buying the same Jeep he purportedly sold the Zwanks. During the ensuing conversation, Mattox "understood" that Groves was selling the vehicle on the behalf of Lynn's Auto Sales. Furthermore, Mattox had "done some business with Lynn" before. The two agreed upon a price, and Wholesale's account was drafted by Kemper for $18,500. The draft was payable to Lynn's Auto Sales and written by Kemper on behalf of Wholesale. In determining whether to pay the draft when it was eventually presented to him for payment, Mattox inquired into the location of the Jeep. Groves told him that it was in New Mexico, the locale from which he acquired the vehicle before consummating the Zwank transaction. Given that response, Mattox approved payment of the draft, and Kemper

---

[3]This left a balance in the account of $2,199.82.

3

acknowledged receiving the proceeds of same. Title was transferred to Mattox, as opposed to the Zwanks.

Needless to say, dispute eventually arose as to who owned the Jeep. Mattox said Wholesale did, while the Zwanks believed they did. Yet, the Zwanks delivered the vehicle to Wholesale after it acquired an attorney. The latter had sent the Zwanks a letter affording them three options. They could either return the vehicle, retain the vehicle and be sued for conversion, or pay another $19,000 plus sum for it. The Zwanks opted to release the vehicle to Wholesale.

The Zwanks sued Kemper and Groves. Their causes of action sounded in breach of contract, fraud, conversion, conspiracy and declaratory judgment. Discovery revealed that Kemper originally authorized Groves to buy the Jeep "through Lynn's Auto Sales" from a Chevrolet dealer in New Mexico. Payment was made through a draft executed by Groves against the account of Lynn's Auto Sales with the approval of Kemper. Bender Chevrolet (Bender) then assigned title to the Jeep to Lynn's Auto Sales. Kemper also authorized Groves to take and retain possession of the vehicle. Indeed, evidence indicates that Kemper never obtained possession of it himself. Rather, Groves kept it until the Jeep was released to the Zwanks. Moreover, Kemper admitted, via deposition, that "any action that . . . Groves might have taken, as relates to either . . . buying or . . . selling of a vehicle, either buying it on [Kemper's] behalf or selling it to another dealer . . . or individual . . . had to be approved by" Kemper. Finally, Kemper reported to the Internal Revenue Service that he or his business paid Groves $52,239.00 in compensation for the year 1998.

4

Kemper eventually filed both a traditional and no evidence motion for summary judgment. The trial court granted it without specifying the ground or grounds upon which it relied. Thereafter, the Zwanks appealed.

### Standard of Review

The standards of review applicable to traditional and no evidence motions for summary judgment are well-settled. Rather, than discuss them at length, we simply cite the parties to *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548 (Tex. 1985) and *Kimber v. Sideris*, 8 S. W.3d 672, 675 (Tex. App.--Amarillo 1999, no pet.) for a general explanation of same.

### Application of Standard

As previously mentioned, the Zwanks alleged causes of action sounding in breached contract, fraud, conversion, conspiracy and declaratory judgment. In attempting to defeat them via his traditional motion for summary judgment, Kemper alleged that: 1) he "did nothing to imply . . . that Groves was [his] agent with respect to the sale of the . . . Jeep"; 2) he "did not authorize Groves to sell the . . . Jeep . . . and that Kemper received no proceeds that the Plaintiffs paid to Groves for such vehicle"; 3) he did not enter into or breach any contract with the Zwanks or authorize Groves to enter into such a contract on his behalf; 4) he did not defraud Zwanks, convert their "money," or engage in a civil conspiracy with Groves or Mattox; and, 5) the Zwanks were not entitled to a declaratory judgment because no bank account of Groves was under the control or direction of Kemper. Via his no evidence motion, Kemper alleged that there existed no evidence that 1) Groves acted on his behalf when selling the Jeep to the Zwanks, 2) Groves was acting

5

as Kemper's agent when the Jeep was sold to the Zwanks, 3) Kemper represented to the plaintiffs that Groves was his agent, 4) Kemper benefitted from the transaction with the Zwanks, 5) Kemper received proceeds from the sale to the Zwanks, 6) Kemper participated "in any way with respect to Groves' transaction with the" Zwanks, 7) Kemper "is guilty of any acts or omissions that would constitute fraud," 8) Kemper "converted any money of the" Zwanks, 9) Kemper was involved in any conspiracy, 10) Kemper was involved "in any contractual relationship" with the Zwanks, 11) Kemper breached any contract, and 12) anyone other than Groves and the Zwanks are responsible for the Zwanks damages.[4] We now address each ground, though not necessarily in the order raised by Kemper.

*Declaratory Judgment*

Authority requires us to liberally construe the Zwanks' pleadings. *First American Title Ins. Co. of Texas v. Willard*, 949 S.W.2d 342, 352 (Tex. App. - - Tyler 1997, writ denied). In doing so, we read the allegation regarding declaratory relief as requesting an adjudication that Kemper received monies belonging to the Zwanks and that they should be returned. So construed, the allegation is little more than one for money had and received. *See Staats v. Miller*, 243 S.W.2d 686, 687 (Tex. 1951) (stating that all a plaintiff need show to recover under a claim of money had and received "is that the defendant holds money which in equity and good conscience belongs to" the plaintiff); *Miller-Rogaska, Inc. v. Bank One, Texas, N.A.*, 931 S.W.2d 655, 662 (Tex. App.--Dallas 1996,

---

[4]As can be seen, the allegations do not comport with the requirements of Texas Rule of Civil Procedure 166a(i). That is, Kemper's allegations of no evidence are global and do not specify "the elements as to which there is no evidence." Such specificity is required according to Rule 166a(i). Yet, because the Zwanks did not specially except to the allegations or otherwise complain of their form, we consider the defects waived.

no writ) (stating the same); *Gray v. Laketon Wheat Growers*, 240 S.W.2d 353, 356 (Tex. Civ. App.--Amarillo 1951, no writ) (stating the same). Moreover, evidence appears of record indicating that some of the money Groves received from the Zwanks was eventually deposited into the account of Kemper. Simply put, one cannot deposit $19,000 into an account initially containing $4000 and then withdraw over $20,000 without encroaching on the $19,000 deposit. And, Kemper acknowledged receiving the $20,000 from Groves. Consequently, a material issue of fact existed regarding the viability of the Zwanks' request for declaratory relief.

*Breach of Contract — No Agency Relationship*

The Zwanks alleged that they bought the Jeep from Groves who was acting as agent for or on behalf of Kemper. So too did they allege that because they never received title to the vehicle which Groves and Kemper subsequently sold to Wholesale after the Zwanks paid for it, both Groves and Kemper breached their contract with the Zwanks. Through summary judgment, Kemper attempted to defeat this cause of action by contending that there existed no principal / agent relationship between Groves and Kemper. Thus, Groves could not bind Kemper; nor could the latter be held vicariously liable for Groves' acts, the argument goes. The appellate record, however, contains some evidence creating a material issue of fact on the matter.

Generally, a principal / agent relationship is consensual in nature, and through it, one party agrees to act for and on behalf of the other and be subject to his control. *Sorenson v. Shupe Bros. Co.*, 517 S.W.2d 861, 864 (Tex. Civ. App.--Amarillo 1974, no writ). The control contemplated pertains to the details of the work; simply put, the right to

7

control those details must exist for there to be an agency relationship.  *Royal Mortg. Corp.*
*v. Montague*, 41 S.W.3d 721, 733 (Tex. App.--Fort Worth 2001, no pet.); *Newspapers, Inc.*
*v. Love*, 380 S.W.2d 582, 591 (Tex. 1964) (noting that the right to control the details of the
work is pivotal).   Furthermore, the existence of an agency relationship need not be
established through direct evidence of an expressed agreement.   Rather, it may be
inferred through circumstantial evidence or implied from the conduct of the parties.  *Royal*
*Mortg. Corp. v. Montague*, 41 S.W.3d at 540.

Next, Texas jurisprudence recognizes that one retained to make bargains and
contracts between other persons in matters of trade and commerce is a type of agent.  *Id.*
at 734.  Similarly, one who acquires property from a third person to convey to another is
the latter's agent if it is agreed that the party acquiring the property is to act primarily for
the other's benefit.  *Valley View Cattle Co. v. Iowa Beef Processors, Inc.*, 548 F.2d 1219,
1221 (5th Cir. 1977) (involving the purchase of cattle by Heller which were then sold to
Iowa Beef); *American Employers Ins. Co. v. Kilgore*, 412 S.W.2d 67,69 (Tex. Civ. App.--
1967, writ ref'd n.r.e.); *Restatement (Second) of Agency* §14K (1958).  In other words, if
A acquires property from B to convey it to C, then A is the agent for C if it is agreed,
between A and C, that A is to act primarily for C, as opposed to A, during the transaction.
Finally, each proposition appears to be little more than a reiteration of a comment made
by the Texas Supreme Court in *Newspapers, Inc.*  There, the court stated that in "absence
of evidence showing a different relationship between the parties, the fact that the alleged
servant was performing services peculiar to the principal's business or affairs establishes

8

prima facie that the relationship of master and servant exists between them." *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 591-92 (Tex. 1964).[5]

In the record before us, we find evidence that Groves and Kemper discussed the purchase of the Jeep from Bender in New Mexico. During that discussion, Kemper authorized Groves to buy the vehicle through Lynn's Auto Sales. Upon receiving that authorization, Groves executed, with Kemper's authority, a site draft in the amount of $17,850 payable to Bender. On the signature line of the draft appeared the following inscription: "Lynn's Auto Sales Mike Groves." Thereafter, Kemper "personally authorize[d] payment of [the] draft to Bender Chevrolet," which payment was made on November 15, 1998. During the interim, Groves took possession of the vehicle with Kemper's approval and retained it. And, though he did not see the vehicle after Groves acquired it, Kemper nonetheless arranged to have "Southwest Auto Sales to floor it for" him, *i.e.* Kemper, on Southwest's line of credit. So too did he ultimately receive from Groves some, if not all, of the consideration paid by the Zwanks for the Jeep.

Other evidence indicates that this was not the first time Groves bought vehicles on behalf of Kemper d/b/a Lynn's Auto Sales. Though he could not recall the year in which "Groves first start[ed] working for" him or the number of times Groves bought vehicles

---

[5]That the Supreme Court referred to a master / servant relationship in speaking does not detract from the applicability of *Newspapers, Inc.* to a principal / agent relationship. It also referred to the master as a principal in the passage quoted. *Newspapers, Inc. v. Love*, 380 S.W.2d 582, 591-92 (Tex. 1964). The reason for this may be best explained by allusion to the *Restatement (Second) of Agency*. There, we are told that a "master is a species of principal, and a servant is a species of agent." *Restatement (Second) of Agency* §2, comment a (1958). In other words, a master falls under the classification of a principal and a servant under the classification of an agent, though not every agent may be a servant. *Id.* So, it would seem that comments regarding the relationship of master /servant would be helpful in assessing the existence of a principal / agent relationship.

through Lynn's Auto, Kemper stated that he alone would authorize payment of the drafts executed as part of those transactions. So too would he have to approve each purchase and sale by Groves. And, upon Groves completing a purchase or sale, Kemper would pay him a commission. Compensation given Groves by Kemper for the year 1998 (the year in which the Zwanks attempted to buy the Jeep) approximated $52,239.

Finally, concerning the ultimate disposition of the Jeep, Kemper directed that it be sold, and title conveyed, to Wholesale for $18,500, despite Groves attempt to sell it to the Zwanks. Moreover, the $18,500 sum was paid via a draft executed by Kemper on behalf of Wholesale and identifying Lynn's Auto Sales as the payee. On the signature line of the draft, Kemper wrote: "Wholesale Auto Center Lubbock, Tx c/o John Mattox by Mike Groves."

The foregoing is some evidence of an ongoing, consensual business relationship between Kemper and Groves wherein the latter agreed to submit to the control of Kemper regarding the details of the transactions involved. That is, Kemper not only decided whether a vehicle should be bought but also loaned his credit (or that of his business) to the transaction, determined how the acquisition was financed during the interim, allowed Groves to execute commercial instruments on behalf of and obligating Lynn's Auto as part of the transaction, determined who would possess the vehicle until sold, and decided to whom title would be transferred (despite Groves own efforts to sell the vehicle). And, in exchange for his involvement in the transaction, Groves received substantial compensation from Kemper (at least during the year 1998).

10

The circumstances described in the preceding paragraphs also constitutes some evidence that Groves acquired and acquires property from a third person to convey to Kemper and that in doing it, Groves acted primarily for the benefit of Kemper in acquiring, retaining and ultimately disposing of it. In short, Groves may have received a commission when the transaction was over, but he did not acquire the vehicle for himself or his own business. He did not control its acquisition or final disposition. He merely acted on behalf, pursuant to the direction, and for the primary benefit of Kemper, much like an paid employee works for an employer. At the very least, a material issue of fact exists regarding the matter.[6] And, that the Zwanks may not have known of the principal in the relationship at the time they dealt with Groves matters not. *See First Nat. Bank of Wichita Falls v. Fite*, 131 Tex. 523, 115 S.W.2d 1105, 1109-10 (Tex. Comm'n App. 1938, opinion adopted) (holding that an agent may make a contract for his undisclosed principal in his own name, and the principal may sue or be sued on the contract); *Sanroc Co. v. Roadrunner Transp., Inc.,* 596 S.W.2d 320, 322 (Tex. App.-Houston [1st Dist.] 1980, no writ) (holding same). Thus, Kemper was not entitled, as a matter of law, to summary judgment

---

[6]To the extent that Kemper may have placed in issue the extent of Groves' authority to sell the Jeep, we also note that a material question of fact exists as to that. Again, evidence indicates that 1) Kemper authorized Groves to retain possession of the vehicle, 2) Groves previously sold vehicles for Kemper, 3) Groves contacted Wholesale and negotiated the sale of the Jeep to it, 4) the Jeep was subsequently sold to Wholesale, and 5) Kemper himself executed a draft on behalf of Wholesale obligating Wholesale to pay Lynn's Auto for the vehicle. Groves contacting and negotiating the transfer to Wholesale when added to Kemper's act of implicitly approving Groves' actions by his (Kemper's) executing the draft to secure payment is some evidence indicating that Groves' authority included negotiating the sale of the vehicle for Kemper. *See Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 837 (Tex. App.--Amarillo 1993, writ denied) (reiterating the general rule that an agent's authority is presumed to be coextensive with the business entrusted to his care).

on the issue of agency and the existence of a breach regarding the contract with the Zwanks.[7]

*Fraud and Conversion*

Regarding the allegations of fraud, Kemper attempted to defeat them via summary judgment by stating that he personally was guilty of no acts or omissions constituting fraud. Given the context in which the ground was asserted, we read it as focusing upon the purported independence of Groves. Due to that independence, Kemper apparently believed that none of Groves' acts could be attributed to him, *i.e.* Kemper.[8] Evidence of record creates a material issue of fact on the matter.

As we stated while addressing the proceeding issue, a material issue of fact exists regarding whether Kemper and Groves were involved in a principal / agent relationship. Assuming that a fact-finder were to lend credence to that evidence and conclude that such a relationship indeed existed, then the principal (Kemper) would be responsible for the acts of the agent (Groves) undertaken within the scope of the relationship. *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 837 (Tex. App.--Amarillo 1993, writ denied). And, because the Zwanks alleged that Groves uttered one or more misrepresentations during the course of their transaction with him and Kemper may be liable for same given the potential agency relationship, a material issue of fact exists

---

[7]A's negotiating the sale of a car to B, receiving the negotiated price from B, delivering the vehicle to B, informing B that title is forthcoming, then transferring title and, hence, ownership of the car to C is some evidence creating a material issue of fact concerning the existence of a breached contract.

[8]Again, we are relegated to interpreting the grounds uttered in Kemper's summary judgment motion since they are very indefinite when tested against the standards of Rule 166a(i) and the Zwanks failed to specially except to them.

concerning whether Kemper was "guilty of any acts or omissions that would constitute fraud . . . ."[9]

*Conversion*

Next, though indefinite and global, we read Kemper's attack upon the claim of conversion to be founded on grounds similar to those levied against the claim of fraud. He apparently contends that since the Zwanks dealt exclusively with Groves, he (Kemper) did nothing which could be construed as converting monies of the Zwanks. Thus, he was supposedly entitled to summary judgment on the claim as a matter of law. We disagree.

Much like the allegations regarding fraud, if Kemper and Groves were involved in an agency relationship, then Groves' tortious acts are imputable to Kemper if done within the scope of his authority. *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d at 837. And, there exists a material issue of fact concerning whether such an agency relationship existed when Groves negotiated the sale of the Jeep to the Zwanks, as discussed under the prior issues. So, summary judgment on the ground asserted was improper.[10]

*Conspiracy*

Lastly, Kemper attempted to defeat the claim of conspiracy by alleging that there was no evidence that he engaged in same. On appeal, the Zwanks argue that summary

---

[9]We venture no opinion on whether the conduct of Groves constituted fraud. That was not the basis of Kemper's summary judgment, according to our construction of the grounds he asserted.

[10]Since it was not raised below, we do not address whether the Zwanks had a viable claim for conversion because monies were purportedly converted. *See Estate of Townes v. Townes*, 867 S.W.2d 414, 419 (Tex. App.--Houston [14th Dist.] 1993, writ denied) (holding that money is subject to conversion only when it can be described or identified as a specific chattel and not where an indebtedness may be discharged by the payment of money generally); *Edlund v. Bounds*, 842 S.W.2d 719, 727 (Tex. App.--Dallas 1992, writ denied) (holding the same).

judgment was improper because evidence indicated that Kemper and Groves conspired to sell the Jeep to two different people.

To prove a civil conspiracy, the claimant must establish, among other things, that the participants in the alleged conspiracy had a meeting of the minds on the object or course of action. *Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 528 (Tex. App.--Amarillo 1998, pet. denied). The Zwanks cite us to no direct or circumstantial evidence from which one could reasonably infer or conclude that Kemper and Groves agreed to sell the Jeep first to the Zwanks and then to Wholesale.

Nor are we cited to any evidence of record indicating that Kemper 1) specifically intended to sell the vehicle to two separate parties at any time prior to the conveyance to Wholesale or 2) knew of Groves efforts or intent to do so. *See Firestone Steel Prod. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996) (holding that civil conspiracy requires specific intent and knowledge of the harm or the wrongful conduct at the beginning of the combination or agreement). That evidence exists indicating that Kemper may have received the proceeds does not fill the void. This is so because nothing suggests that Kemper handled the check issued by the Zwanks. Nor does any evidence illustrate that he knew the source of the funds contained in Groves' checking account or that the funds used to pay the two checks issued him by Groves were monies originally transferred from the Zwanks. Consequently, the Zwanks failed carry their burden of proof and present some evidence on each element of their conspiracy claim.

14

Accordingly, we affirm the summary judgment to the extent that it denies recovery upon the claim of civil conspiracy. However, we reverse it in all other respects and remand the cause to the trial court for further proceedings.

Brian Quinn
Justice

Do not publish.