COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
NO. 2-01-405-CV
SITQ E.U., INC., SITQ HOLDINGS                                                      
APPELLANTS
(U.S.), INC., CANDEREL CORP., AND
JONATHAN WENER
V.
REATA RESTAURANTS, INC.,                                                        
   APPELLEES
REATA RESTAURANTS MANAGEMENT
CO., LTD., LAW, SNAKARD &
GAMBILL, P.C., MARVIN E. BLUM &
ASSOCIATES, P.C., AND RANGE
RESOURCES CORPORATION
------------
FROM THE 348
TH DISTRICT COURT OF
TARRANT COUNTY
------------
OPINION
------------
I. Introduction
       
In this interlocutory appeal, SITQ E.U., Inc., SITQ Holdings (U.S.), Inc.,
Canderel Corp., and Jonathan Wener (collectively, appellants) appeal the trial
court's denial of their special appearance motions challenging the trial court's
exercise of personal jurisdiction over them. Because we conclude that appellants
had sufficient contacts with Texas to support the exercise of specific
jurisdiction, we will affirm.
II. Background Facts &
Procedural History
       
SITQ E.U., Inc. is a Canadian corporation that owns 100% of SITQ Holdings
(U.S.), Inc.(1) SITQ Holdings is a Delaware
corporation. Canderel Corp. is a Delaware corporation. Wener owns 100% of the
entity that wholly owns Canderel, and he is the chairman, CEO, and sole director
of Canderel and its parent company. At all times pertinent to this case, Wener
controlled Canderel either directly or indirectly.
       
In the late 1990s, SITQ Holdings, Wener, Canderel, and Ronald Cherry, a Texas
resident, made a conscious decision to acquire real estate in Texas. Pursuant to
this plan, Wener, Jean-Francios Fournier, an asset manager for SITQ EU and SITQ
Holdings, and other representatives of SITQ Holdings came to Texas to view real
estate before purchasing it. One piece of real estate that they inspected was
the Bank One Tower (the Tower) in Fort Worth.
       
Loutex Portfolio GP, Inc.,(2) SITQ Holdings,
Canderel, and CW Dalcan Investments, Inc.(3)
formed Loutex Portfolio LP (Loutex Portfolio) to "acquire . . . , lease,
manage, maintain, finance and sell" real estate in Texas, Louisiana, and
Oklahoma, including the Tower.
       
Loutex Portfolio had two limited partners: SITQ Holdings and Canderel/Dalcan
Investments. SITQ Holdings owned 90% of Loutex Portfolio. Initially, Dalcan
Investments owned the other 10%, but Canderel became the successor in interest
to Dalcan Investments and agreed to be bound by the Loutex Portfolio partnership
agreement. Thereafter, Canderel and Dalcan Investments were deemed to be one
limited partner and spoke with one voice regarding decisions or representations
concerning Loutex Portfolio.
       
In the fall of 1998, Loutex Portfolio purchased the Tower with funding provided
by SITQ EU. Loutex Portfolio did not, however, directly own the real property it
acquired. Instead, it created Loutex Fort Worth LP (Loutex FW), which Loutex
Portfolio controlled, to acquire the title to the Tower.
       
Loutex FW was run by a board of managers, which was comprised of Cherry, Yvon
Tessier, and Helene Lafond. These same three individuals made up the board of
directors for Loutex Portfolio. Tessier and Lafond were employed by SITQ, Inc.,
which performed all acts for SITQ EU and SITQ Holdings pursuant to a management
contract.(4) Tessier and Lafond were appointed to
the Loutex entities' boards by SITQ Holdings; Cherry was appointed by Canderel.
       
On March 28, 2000, a tornado severely damaged the Tower. At that time, Reata
Restaurants, Inc., Reata Restaurants Management Co., Ltd., Law, Snakard &
Gambill, P.C., Marvin E. Blum & Associates, P.C., and Range Resources
Corporation (collectively, appellees) were tenants of the Tower. Section 9.01 of
appellees' leases provided that, if the building was damaged by fire or other
casualty, the landlord had the election either "to terminate this Lease or
to repair same with reasonable dispatch." Section 9.02 of the lease
provided that "[i]f Landlord elects to repair and reconstruct as provided
in Section 9.01 hereof, Landlord shall use its reasonable efforts to
effect such repairs and reconstruction in such a manner as not to unreasonably
interfere with Tenant's occupancy."
       
After the March 28 tornado, appellees were informed, through Cherry and others,
that the Tower would be repaired and reopened for occupancy as soon as possible.
Monthly updates on the Tower reconstruction were published to Tower tenants in
the April through July 2000 editions of the Tower Talk newsletter. In
addition, Cherry and/or Loutex assisted Reata with restoration of the Reata
restaurant so that it could reopen in early May 2000.
       
By July 20, 2000, however, the Loutex entities, SITQ Holdings, and Canderel
reached a settlement agreement with the Tower's insurance company. As a result
of that settlement agreement, reconstruction on the Tower was stopped, all of
the tenants' leases were terminated, and the Tower was eventually sold.
       
Thereafter, appellees sued appellants,(5) the
Loutex entities, and Cherry for fraud, negligent misrepresentation, tortious
interference, breach of fiduciary duty, conspiracy, conversion, denuding, and
fraudulent transfers.(6) Appellants filed special
appearances challenging the trial court's personal jurisdiction over them. After
a hearing, the trial court overruled the special appearances, and this appeal
followed.
III. Issues Presented
       
In their first issue, appellants contend that the trial court's exercise of
personal jurisdiction over them is improper because they lack the requisite
minimum contacts with Texas. They assert there is no evidence that they
purposefully engaged in business in Texas with regard to the Tower or its
tenants; had any dealings or contacts with appellees; or had any other contacts
with Texas that were sufficient to permit the trial court's exercise of specific
jurisdiction over them. Appellants also argue that the fiduciary shield doctrine
protects Wener from the trial court's exercise of personal jurisdiction over him
because any contacts he had with Texas were only in his capacity as a
representative of Canderel.
       
Appellees contend that each of the appellants had sufficient contacts with Texas
to make them amenable to suit here, including the commission of a tort in whole
or in part in Texas. Appellees assert that their tort claims against appellants
for fraud, negligent misrepresentation, tortious interference, conspiracy,
conversion, denuding, and fraudulent transfers all arose out of appellants'
post-tornado conduct concerning the Tower and its tenants.
IV. Standard of Review
       
Whether a trial court has personal jurisdiction over a defendant is a question
of law. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794
(Tex. 2002); Hotel Partners v. Craig, 993 S.W.2d 116, 120 (Tex.
App.--Dallas 1994, writ denied). The plaintiff bears the initial burden of
pleading sufficient allegations to bring a nonresident defendant within the
provisions of the long-arm statute. Marchand, 83 S.W.3d at 793; McKanna
v. Edgar, 388 S.W.2d 927, 930 (Tex. 1965). A defendant who challenges a
trial court's exercise of personal jurisdiction through a special appearance
bears the burden of negating all jurisdictional bases. Kawasaki Steel Corp.
v. Middleton, 699 S.W.2d 199, 203 (Tex. 1985); Fish v. Tandy Corp.,
948 S.W.2d 886, 891 (Tex. App.--Fort Worth 1997, writ denied).
       
When reviewing an order granting or denying a special appearance, we review all
of the evidence. Fish, 948 S.W.2d at 892. Where, as here, the trial
court does not issue findings of fact and conclusions of law with its special
appearance ruling, all fact findings necessary to support the judgment are
implied. Marchand, 83 S.W.3d at 795; Worford v. Stamper, 801
S.W.2d 108, 109 (Tex. 1990); Fish, 948 S.W.2d at 892. Because the
appellate record includes both the clerk's and reporter's records, however,
these implied findings are not conclusive; we review the trial court's
resolution of disputed fact issues for both legal and factual sufficiency and
the trial court's legal conclusions de novo. Marchand, 83 S.W.3d at
795. We must affirm the trial court's ruling on jurisdiction if we can uphold it
on any legal theory supported by the evidence, regardless of whether the trial
court articulated the correct reason for the ruling. Fish, 948 S.W.2d
at 892; see also Marchand, 83 S.W.3d at 794 (stating that if trial
court's conclusion of law is erroneous, but trial court rendered proper
judgment, erroneous legal conclusion does not require reversal).
V. Personal Jurisdiction
A. Texas Long-Arm Statute
and Due Process
       
The Texas long-arm statute governs the Texas courts' exercise of personal
jurisdiction over nonresident defendants. Tex. Civ. Prac. & Rem. Code Ann.
§§ 17.041-.045 (Vernon 1997 & Supp. 2003); Marchand, 83 S.W.3d at
795. The statute permits Texas courts to exercise jurisdiction over a
nonresident defendant who "does business" in the state, including by
the commission of a tort, in whole or in part. Tex. Civ. Prac. & Rem. Code
Ann. § 17.042; Marchand, 83 S.W.3d at 795. The list in section 17.042
is not exhaustive, however, and the Supreme Court of Texas has held that the
long-arm statute extends Texas courts' personal jurisdiction as far as the
requirements of federal due process will allow. Marchand, 83 S.W.3d at
795; U-Anchor Adver., Inc. v. Burt, 553 S.W.2d 760, 762 (Tex. 1977), cert.
denied, 434 U.S. 1063 (1978).
       
Due process is satisfied when (1) the defendant has established minimum contacts
with the forum state (2) such that the exercise of jurisdiction does not offend
traditional notions of fair play and substantial justice. Int'l Shoe Co. v.
Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945). Because of the
unique and onerous burden placed on a party called upon to defend a suit in a
foreign legal system, the minimum contacts analysis is particularly important
when the defendant is from a different country. Asahi Metal Indus. Co. v.
Superior Court, 480 U.S. 102, 114, 107 S. Ct. 1026, 1033 (1987); Marchand,
83 S.W.3d at 795.
       
Under the minimum contacts analysis, we must determine whether the nonresident
defendant has purposefully availed itself of the privilege of conducting
activities within the forum state, thus invoking the benefits and protections of
its laws. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75, 105 S.
Ct. 2174, 2183 (1985). The "purposeful availment" requirement ensures
that a nonresident defendant will not be haled into a jurisdiction based solely
upon random, fortuitous, or attenuated contacts or the unilateral activity of
another party or a third person. Id. at 475, 105 S. Ct. at 2183; Guardian
Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C., 815 S.W.2d 223,
226 (Tex. 1991).
       
Although not determinative, foreseeability is an important consideration in
deciding whether the nonresident defendant has purposefully established minimum
contacts with the forum state. Guardian Royal, 815 S.W.2d at 227.
Foreseeability is not an independent component of the minimum contacts analysis,
but is implicit in the requirement that there be a "substantial
connection" between the nonresident defendant and Texas arising from the
action or conduct of the nonresident defendant purposefully directed towards
Texas. Id. Individuals must have fair warning that a particular
activity may subject them to the jurisdiction of a foreign sovereign. Burger
King, 471 U.S. at 472, 105 S. Ct. at 2182; Guardian Royal, 815
S.W.2d at 226; see also World-Wide Volkswagen Corp. v. Woodson, 444
U.S. 286, 297, 100 S. Ct. 559, 567 (1980) (holding that the foreseeability
critical to due process "is that the defendant's conduct and connection
with the forum State are such that he should reasonably anticipate being haled
into court there").
B. Specific v. General
Jurisdiction
       
Personal jurisdiction exists if the nonresident defendant's minimum contacts
give rise to either specific jurisdiction or general jurisdiction. Helicopteros
Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 413-14 & nn. 8-9,
104 S. Ct. 1868, 1872 & nn. 8-9 (1984); Guardian Royal, 815 S.W.2d
at 227. Specific jurisdiction is established if the nonresident defendant's
alleged liability arises from or is related to the defendant's purposeful
contact with the forum. When specific jurisdiction is asserted, the minimum
contacts analysis focuses on the relationship among the defendant, the forum,
and the litigation. Guardian Royal, 815 S.W.2d at 227-28.
       
It is not necessary that a nonresident defendant's conduct actually occur in
Texas, as long as the defendant's acts were purposefully directed towards the
state. Calder v. Jones, 465 U.S. 783, 789-90, 104 S. Ct. 1482, 1487
(1984); CSR Ltd. v. Link, 925 S.W.2d 591, 595 (Tex. 1996) (orig.
proceeding); Whalen v. Laredo Nat'l Bancshares, Inc., 37 S.W.3d 89, 92
(Tex. App.--San Antonio 2000, pet. denied), disapproved on other grounds by
BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789 (Tex. 2002).
"[A] defendant should reasonably anticipate being haled into court where
the effects of its conduct have been intentionally caused through the purposeful
direction of activity toward the forum state, even if the defendant never
physically enters the state." Cole v. The Tobacco Inst., 47 F.
Supp. 2d 812, 815 (E.D. Tex. 1999).
VI. Specific
Jurisdiction--Minimum Contacts Analysis
A. Appellees' Allegations
of Jurisdictional Facts
       
To support the trial court's exercise of jurisdiction over appellants, appellees
asserted the following jurisdictional facts with respect to their tort claims:

 The Loutex entities, SITQ Holdings, and
 Canderel entered into a settlement agreement with the Tower's insurer
 relating to the March 2000 tornado, and the insurer paid $80 million in
 settlement proceeds. Loutex FW transferred a substantial portion of the
 settlement proceeds to each of the appellants. The transfers, which were the
 result of a conspiracy among appellants, were fraudulent and denuded Loutex
 FW of its assets, leaving appellees and others who had claims against Loutex
 FW without recourse for payment.
  
 Appellants conspired with the Loutex
 entities and Cherry to commit conversion by agreeing, for their own benefit,
 to pursue a course of action pursuant to which they received and distributed
 the insurance proceeds to the exclusion of appellees' rights to an interest
 in the proceeds.
  
 For their personal benefit, appellants
 conspired with Cherry to interfere, and tortiously interfered, with the
 contractual relationship between Loutex FW and appellees by causing Loutex
 FW to terminate their leases, or by preventing Loutex FW from continuing to
 repair and reconstruct the Tower, as it had elected to do under the leases.
 Appellants acted in concert with Cherry to cause Loutex FW to breach the
 leases so that appellants could reap the windfall of collecting the
 insurance proceeds without spending them.
  
 Acting by and through Cherry,
 appellants made, and caused Loutex FW to make, various misrepresentations to
 appellees that the Tower would be reconstructed by Loutex FW, which
 appellees relied on to their detriment. Appellees knew the representations
 were false, or made with an intent not to perform, or that the
 misrepresentations were recklessly or negligently made.
   

       
Appellants do not contend that appellees failed to allege sufficient
jurisdictional facts with regard to all of their causes of action. Thus, without
listing the elements of each of appellees' claims, we hold that appellees
alleged sufficient jurisdictional facts to support one or more of their claims
against appellants, including the claims for tortious interference with
contract, conspiracy to tortiously interfere,(7)
and fraudulent transfers.(8) Appellants'
complaints center primarily around whether there is sufficient evidence to
establish these alleged minimum contacts; therefore, we turn to the evidence
pertinent to appellees' jurisdictional allegations.
B. Evidence Relevant to
Minimum Contacts
       
There is conflicting evidence about appellants' activities concerning the Tower
and its tenants following the March 2000 tornado. Cherry testified at the
special appearance hearing that to the best of his knowledge, only Loutex FW and
Loutex Portfolio voted on whether to accept the insurance settlement and sell
the Tower and that neither the SITQ entities nor Canderel did anything to
interfere with the performance of the Tower tenants' lease contracts. Tessier
testified that the SITQ entities and Canderel did not have the authority to
cancel or modify the sale of the Tower. Tessier further testified that neither
SITQ EU nor SITQ Holdings had any right of control over Loutex FW's
decision-making, nor did the SITQ entities attempt to exercise any right of
control over Loutex FW's decisions following the tornado. Cherry testified that
Canderel did not directly participate in, or make, the decisions to accept the
insurance settlement or to terminate the tenants' leases.
       
Tessier was involved in the decision-making process with respect to the Tower,
but there is conflicting evidence concerning the capacity in which he made those
decisions. In addition to serving on boards of the Loutex entities, Tessier was
a member of SITQ Holdings' board of directors and a first vice president of SITQ
EU, and he oversaw the SITQ entities' investments around the world. Tessier
stated by affidavit that all of his dealings with Texas regarding the Tower were
in his capacity as a member of the Loutex entities' boards of managers, yet he
signed the insurance settlement agreement on behalf of both the Loutex entities
and SITQ Holdings.
       
After the tornado, Jean-Francios Fournier traveled to Texas to look at the
Tower. Fournier was an asset manager for the SITQ entities and oversaw their
investments in the United States. He was also a vice president for Loutex
Portfolio's general partner. Tessier testified at the special appearance hearing
and by affidavit that the Loutex entities' boards of managers asked Fournier to
follow the aftermath of the tornado and report to them. Tessier stated that all
of Fournier's trips to and communications with Texas regarding the Tower were as
a representative of the Loutex entities' boards. As discussed below, however,
there is evidence that Fournier also acted on the SITQ entities' behalf
concerning the Tower.
       
In addition, there is other evidence that after the tornado appellants played an
active role in the decision-making process with respect to the Tower and its
tenants. For example, although the decisions for the Loutex entities were made
by their three-member boards of managers, Tessier conceded that the boards did
not make their decisions without consulting someone from SITQ Holdings. Tessier
also acknowledged that SITQ Holdings, Loutex Portfolio, and Loutex FW existed
only to hold the real estate that was acquired in Texas and that they operated
as a single business enterprise. Further, Cherry was responsible for keeping
SITQ Holdings and Canderel informed of developments, through Fournier and Wener,
and there is evidence that he had to obtain Fournier's and Wener's approval
before accepting the settlement from the insurance company and disposing of the
Tower.
       
In a series of emails from May through July 2000, Tessier, Fournier, Wener, and
Cherry discussed the ongoing negotiations with the insurance company and their
options if no settlement was reached. On May 31, Cherry emailed Fournier, asking
him whether "SITQ" agreed to Cherry's recommendation regarding
reconstruction of the Tower.
       
On June 12, Cherry advised Fournier and Wener of the strategy that Loutex
Portfolio's board of managers had developed for dealing with the insurance
company, which would involve giving the insurance company the opportunity to
offer a "walk-away" price for the building rather than paying for
reconstruction. Wener understood "walk-away" to mean that the Tower
would not be rebuilt. Cherry wanted to explain everything to Fournier by
telephone and "be in full agreement with you before we execute the critical
pieces" at a June 16 meeting in Montreal, Canada, with the insurance
company. Fournier and Wener "permitted [the walk-away strategy] to go
forward."
       
On June 16, 2000, Fournier, Tessier, Cherry, Wener, and several others met with
the insurance company in Montreal to discuss their options concerning the Tower,
including the walk-away strategy. In a June 27 email to Fournier, Wener, and
Tessier, Cherry referenced these four individuals' agreement that the insurance
company would only receive guidance as to a settlement amount from Cherry, but
promised to "reserve final approvals for you." In response, Wener
urged Fournier and Tessier to support Cherry fully and defer to him "to
maximize our [insurance] settlement" and "ensure our mutual best
interests."
       
On July 5, 2000, Tessier, Fournier, and Cherry met again with the insurance
company in Dallas to discuss their options, including a settlement amount.
Cherry represented Canderel at the July 5 meeting. Cherry was also Wener's
designated representative with regard to voting on the insurance settlement, and
he was obligated to vote in accordance with what Wener wanted.
       
On July 7, Fournier informed Cherry of the minimum amount that SITQ would accept
in settlement, and Cherry later reported that he had countered the insurance
company's settlement offer based on this information "as a strategy
previously agreed upon with SITQ." Cherry also recommended to Fournier and
Wener that the Tower be reconstructed if he was unable to negotiate an insurance
settlement.
       
In June and July 2000, while Cherry, Fournier, Tessier, and Wener were pursuing
the walk-away strategy with the Tower's insurer, Loutex FW, through Cherry and
others, continued to represent to the Tower tenants that the Tower would be
repaired and reopened for occupancy. Monthly updates on the Tower reconstruction
were published to the Tower tenants in the April through July editions of the Tower
Talk newsletter. The July 20, 2000 edition of Tower Talk informed
tenants that:

 We are still on the schedule reported
 last week in regards to our projected dates for floors 18, 23, 26, 27 and 29.
 We are hoping to have several more floors ready by September 30th.
 You will be notified as soon as we have carpet delivery dates, so that you can
 plan your move.

           
. . . .

 . . . When the renovation is
 finished, you will virtually be in a brand new building, more beautiful, more
 energy efficient, and we will be able to eliminate concerns regarding indoor
 air quality.

       
In his capacity as asset manager for Loutex FW, Cherry was responsible for these
communications and their content. But the communications were initiated because
Loutex Portfolio and the SITQ entities wanted the tenants to be informed about
what was happening with regard to the Tower. The SITQ entities knew the Tower
tenants would rely on these communications, and Cherry was responsible for
keeping the SITQ entities' asset manager (Fournier) informed of what was going
on. Cherry also communicated with Fournier and Wener by email concerning what
"we" (he, Fournier, and Wener) had done to notify the Tower tenants
concerning reconstruction.
       
By July 20, 2000, however, the Loutex entities, Canderel, and SITQ Holdings had
reached a settlement agreement with the insurance company concerning the Tower.
Cherry, Lafond, and Tessier signed the agreement on behalf of Loutex FW and
Loutex Portfolio; Tessier and Fournier signed on behalf of SITQ Holdings; and
Douglas Pascal, Canderel's president, signed on behalf of Canderel. The
settlement agreement was governed by Texas law. The $80 million in settlement
proceeds was distributed primarily to SITQ EU, SITQ Holdings, Canderel and/or
Wener, Cherry, and CW Dalcan Management Services, a company jointly owned by
Cherry and Canderel or Wener. Loutex Portfolio reserved $11 million of the
proceeds.
       
SITQ EU, through SITQ Holdings, approved the insurance settlement and authorized
the sale of the Tower. An officer of SITQ EU, through SITQ Holdings, was also
authorized to act jointly with the Loutex entities to negotiate and execute any
documents and take any other action they considered appropriate in order to give
effect to SITQ EU's resolution approving the insurance settlement.
       
There is also evidence that the SITQ entities authorized Cherry to speak on
their behalf concerning their decisions to (1) terminate the tenants' leases,
(2) not proceed with reconstruction of the Tower, and (3) market the Tower for
resale or demolish it.(9) Cherry was instructed
to say that it was "not economically feasible to restore the building to
the standards of safety which we believe are necessary for our tenants[;]
therefore we are releasing the tenants from their lease obligations so that they
may pursue the leasing of other premises to continue their businesses." He
was also responsible for contacting the tenants who would most likely be angry
about the lease terminations, in order to mitigate the potential for litigation.
       
All of this evidence shows that each of the appellants purposefully directed
activities towards Texas with regard to the Tower and its tenants and that
appellants intended, or at a minimum knew, that the tenants would be adversely
affected by these activities--while appellants stood to reap significant
financial benefits. Although there is conflicting evidence concerning who
actually made the decision to implement the walk-away strategy rather than
reconstructing the Tower, the evidence is legally and factually sufficient to
support the trial court's implied finding that appellants participated in that
decision.
C.
Fiduciary Shield Doctrine
       
Despite Wener's contacts with Texas, appellants assert that he is protected by
the fiduciary shield doctrine from the trial court's exercise of jurisdiction
over him because his only contacts were as Canderel's representative.
       
The fiduciary shield doctrine protects a corporate officer or employee from the
trial court's exercise of general jurisdiction over him when all of the
individual's contacts with Texas were on behalf of the employer. See Siskind
v. Villa Found. for Educ., Inc., 642 S.W.2d 434, 438 (Tex. 1982)
("Absent some allegation of a specific act in Texas, or one with reasonably
foreseeable consequences within this state's borders, a nonresident employee of
a foreign corporation cannot be sued in Texas simply because his or her employer
solicits business here."); Royal Mortgage Corp. v. Montague, 41
S.W.3d 721, 738 (Tex. App.--Fort Worth 2001, no pet.) (noting general rule that
court may not assert personal jurisdiction over individual based on individual's
relation to corporation unless corporation is individual's alter ego). Courts
that have applied the fiduciary shield doctrine, however, have limited its
application to attempts to exercise general jurisdiction over a
nonresident defendant. Brown v. Gen. Brick Sales Co., 39 S.W.3d 291,
300 (Tex. App.--Fort Worth 2001, no pet.); see also Garner v. Furmanite
Australia Pty., Ltd., 966 S.W.2d 798, 803 (Tex. App.--Houston [1st
Dist.] 1998, pet. denied) (holding that fiduciary shield doctrine protected
Australian resident from trial court's exercise of general jurisdiction when his
only contacts with Texas were on his employer's business).
       
A corporate officer or employee is not shielded from the exercise of specific
jurisdiction as to torts for which the officer or employee may be held
individually liable. Tuscano v. Osterberg, 82 S.W.3d 457, 467-68 (Tex.
App.--El Paso 2002, no pet.); see also Calder, 465 U.S. at 790, 104 S.
Ct. at 1487 (holding that reporter and editor of allegedly defamatory magazine
article were subject to personal jurisdiction); Gen. Elec. v. Brown &
Ross Int'l Distribs., Inc., 804 S.W.2d 527, 532-33 (Tex. App.--Houston [1st
Dist.] 1990, writ denied) (holding that corporate officers who had personally
arranged theft of design plans, ordered counterfeit and mislabeled parts, and
made misrepresentations to customers were subject to personal jurisdiction in
Texas). While individuals' contacts with a forum are not to be analyzed based on
their employer's activities in that forum, "their status as employees does
not somehow insulate them from jurisdiction." Calder, 465 U.S. at
790, 104 S. Ct. at 1487. There is no blanket protection from jurisdiction simply
because a defendant's alleged acts were done in a corporate capacity. D.H.
Blair Inv. Banking Corp. v. Reardon, 97 S.W.3d 269, 277 (Tex. App.--Houston
[14th Dist.] 2002, pet. filed) (op. on reh'g); Brown, 39
S.W.3d at 300. Instead, "[e]ach defendant's contacts with the forum State
must be assessed individually." Calder, 465 U.S. at 790, 104 S.
Ct. at 1487.
       
Corporate agents are individually liable for fraudulent or tortious acts
committed while in the service of their corporation. Shapolsky v. Brewton,
56 S.W.3d 120, 133 (Tex. App.--Houston [14th Dist.] 2001, pet.
denied). Further, if a corporate officer knows that the brunt of the alleged
tort will be felt by a particular resident in the forum, he must reasonably
anticipate being haled into court there to answer for his actions. Id.
at 134.
       
Appellees alleged that the trial court had specific jurisdiction over Wener
based on tortious activities that he purposefully directed towards Texas, and
the record supports appellees' jurisdictional allegations. In mid-June 2000,
Wener was aware of the "walk-away" strategy involving the Tower, and
he permitted the strategy to go forward, even though he knew that it would mean
the Tower would not be rebuilt and the tenants' leases would be terminated.
Wener met with the insurance company to discuss the options concerning the
Tower, including the walk-away strategy. He also directed Cherry, as his
designated representative, to vote in favor of the insurance settlement. This
evidence shows that Wener had sufficient minimum contacts with Texas to support
the exercise of specific jurisdiction over him individually, even if all of his
activities directed towards Texas were done in his capacity as Canderel's
chairman, CEO, and sole director. Accordingly, the trial court properly
concluded that Wener was not protected from jurisdiction by the fiduciary shield
doctrine.
D. Cherry's Agency
       
Appellants contend that Cherry's conduct cannot be imputed to them for
jurisdictional purposes because there is no evidence that Cherry was their
agent. An agent is a person who is authorized to act for another and is subject
to the control of the other. Royal Mortgage Corp., 41 S.W.3d at 732. An
agency relationship may be implied from the parties' conduct. Orozco v.
Sander, 824 S.W.2d 555, 556 (Tex. 1992); Royal Mortgage Corp., 41
S.W.3d at 732.
       
There is legally and factually sufficient evidence to support the trial court's
implied finding that Cherry acted as appellants' agent, at least with regard to
the insurance settlement. Cherry testified at the special appearance hearing
that he had never acted or been authorized to act on behalf of the SITQ
entities; that he was controlled solely by the Loutex entities' boards of
managers;(10) and that whenever he had any
specific dealings with Lafond or Tessier, he understood them to be acting as
members of these boards. There is other evidence, however, that Cherry was
subject to appellants' control with regard to the decision of whether to settle
with the insurance company or proceed with reconstructing the Tower. Although
Cherry was the only person to negotiate with the insurance company concerning a
settlement amount, this was by agreement with Fournier, Wener, and Tessier, who
had the right of final approval. Further, Cherry's counter-proposal to the
insurance company's settlement offer was based on what Fournier, the SITQ
entities' asset manager,(11) told Cherry SITQ
would accept and was pursuant to "a strategy previously agreed upon with
SITQ." In addition, Cherry acknowledged at the special appearance hearing
that, as Canderel's appointee to the Loutex boards, he was obligated to vote in
accordance with what Wener wanted regarding the insurance settlement, and there
is evidence that Wener controlled Canderel.
       
Although the evidence regarding who controlled Cherry's actions is conflicting,
the trial court, as finder of fact, was free to resolve any inconsistencies in
support of its implied finding that Cherry acted as appellants' agent concerning
the insurance settlement. See McGalliard v. Kuhlmann, 722 S.W.2d 694,
697 (Tex. 1986) (holding that trier of fact may believe one witness, disbelieve
others, and resolve inconsistencies in their testimony); Royal Mortgage
Corp., 41 S.W.3d at 733 (noting that question of agency is generally one of
fact).(12)
E. Fair Warning
       
We now turn to the issue of whether appellants had fair warning that their
contacts with Texas might subject them to jurisdiction in this state. We
conclude that they did. Appellants' activities directed towards the Tower and
its tenants were such that appellants could reasonably have anticipated being
haled into Texas court to defend a lawsuit arising out of their conduct. Indeed,
the SITQ entities' authorization of, or acquiescence to, Cherry's
post-settlement contacts with the Tower tenants in order to mitigate the
potential for litigation is evidence that appellants were well aware of the
possibility that they might be called to defend against a lawsuit in Texas.
Moreover, the fact that most of Wener's conduct did not actually occur in Texas
does not prevent the trial court's exercise of personal jurisdiction over him.
Wener's purposeful activities directed towards Texas and his knowledge of their
adverse effect on the Tower tenants were such that he should have reasonably
anticipated being haled into Texas court to answer for his conduct. See
Shapolsky, 56 S.W.3d at 134; see also Siskind, 642 S.W.2d at 438
n.5 (stating that due process is satisfied if nonresident defendant's activities
outside of Texas have reasonably foreseeable consequences in the state, even if
the defendant is not physically present).
F. Relationship Between
Appellants' Minimum Contacts
and Appellees' Claims
       
Finally, the relationship between appellants' contacts with Texas and appellees'
claims is sufficient to support specific jurisdiction. Appellees' tort claims
against appellants are directly related to appellants' post-tornado conduct
concerning the Tower and its tenants. Where a plaintiff alleges a tort claim
arising out of a purposeful act committed in or directed towards Texas, the
necessary proof for jurisdictional purposes is only that the nonresident
defendant committed the act. Ring Power Sys. v. Int'l De Comercio Y
Consultoria, 39 S.W.3d 350, 353 (Tex. App.--Houston [14th Dist.]
2001, no pet.); Arterbury v. Am. Bank & Trust Co., 553 S.W.2d 943,
948 (Tex. Civ. App.--Texarkana 1977, no writ).
       
Here, for example, appellees alleged causes of action for tortious interference
and conspiracy to tortiously interfere with their contractual relationship with
Loutex FW arising out of appellants' actions that resulted in the termination of
appellees' leases. Appellees also alleged a cause of action for fraudulent
transfers arising out of appellants' receipt of the majority of the insurance
settlement proceeds. As we have discussed, the evidence shows that appellees'
lease agreements with Loutex FW were terminated as the direct result of an
insurance settlement in which appellants actively participated--with full
knowledge that settlement would result in termination of the leases and
cessation of Loutex FW's reconstruction efforts thereunder. The evidence also
shows that appellants received the majority of the settlement proceeds from
Loutex FW so that those funds would not be available to satisfy appellees'
claims against Loutex FW. Thus, the evidence shows that appellants committed the
acts on which appellees' claims against them are based.
VII.
Conclusion
       
For all of the foregoing reasons, we hold that appellants failed to carry their
burden of negating all bases for the trial court's exercise of personal
jurisdiction over them. See CSR Ltd., 925 S.W.2d at 596.(13)
Accordingly, the trial court correctly concluded that appellants had sufficient
minimum contacts with Texas to support specific jurisdiction. We overrule
appellants' first issue and affirm the trial court's order overruling
appellants' special appearances.(14)
                                                       
   JOHN CAYCE
                                                       
   CHIEF JUSTICE
PANEL A: CAYCE, C.J.; LIVINGSTON and
WALKER, JJ.
DELIVERED: May 22, 2003

1.  SITQ EU is wholly owned by Caisse de Depot, which
is not a party to this case.
2.  Loutex Portfolio GP is a Delaware corporation.
3.  Dalcan Investments is a Texas entity wholly owned
by Cherry.
4.  For simplicity, we sometimes refer to Loutex
Portfolio and Loutex FW as "the Loutex entities" and SITQ EU and SITQ
Holdings as "the SITQ entities." Neither the Loutex entities nor the
SITQ entities had any employees.
5.  Only Reata sued SITQ EU.
6.  The Loutex entities and Cherry are not parties to
this appeal.
7.  The elements of tortious interference with
contract are: (1) the existence of a contract subject to interference; (2) a
willful and intentional act of interference; (3) that proximately causes the
plaintiff's damages; and (4) actual damage or loss. Tex. Beef Cattle Co. v.
Green, 921 S.W.2d 203, 210 (Tex. 1996). The elements of conspiracy are: (1)
two or more persons; (2) an object to be accomplished; (3) a meeting of minds on
the object or course of action; (4) one or more unlawful, overt acts; and (5)
damages as the proximate result. Massey v. Armco Steel Co., 652 S.W.2d
932, 934 (Tex. 1983). We recognize that civil conspiracy between a resident and
a nonresident, standing alone, cannot be the basis for jurisdiction. See
Nat'l Indus. Sand Ass'n v. Gibson, 897 S.W.2d 769, 773 (Tex. 1995). Here,
however, appellees' allegations concerning conspiracy were based on activities
that appellants directed towards Texas.
8.  A fraudulent transfer is one made by a debtor
with the intent to hinder, delay, or defraud its creditors by placing the
debtor's property beyond the creditors' reach. Tex. Bus. & Com. Code Ann. §
24.005(a) (Vernon 2002); Nobles v. Marcus, 533 S.W.2d 923, 925 (Tex.
1976). Insolvency is an element of some, but not all, types of fraudulent
transfers, and appellees do not contend that the transfers in this case rendered
Loutex FW insolvent. See Tex. Bus. & Com. Code Ann. §§ 24.005(a),
24.006. Contrary to appellants' assertion in their brief, a creditor may
recover, from the transferee, judgment for the amount necessary to
satisfy the creditor's claim. See id. §§ 24.008(a)(1), 24.009(b)(1)
(providing that, to the extent a fraudulent transfer is voidable, a creditor may
recover a money judgment from the first transferee or the person for whose
benefit the transfer was made); see also Eckert v. Wendel, 120 Tex.
618, 40 S.W.2d 796, 797 (1931) (stating that defrauded creditor's remedy against
grantee of fraudulently conveyed real estate is suit to avoid
conveyance).
9.  It is unclear from the record whether the SITQ
entities authorized Cherry to speak on their behalf or whether they were simply
aware of, and acquiesced to, Cherry's communications and their content.
10.  Cherry's testimony that he was controlled by
the Loutex entities' boards is curious, given the fact that Cherry was himself a
member of these boards.
11.  Contrary to appellants' assertion in their
brief, Cherry did not testify that he understood Fournier to be acting on behalf
of the Loutex entities' boards.
12.  The evidence does not support a finding that
Cherry made the alleged presettlement misrepresentations to the Tower tenants as
appellants' agent because there is no evidence that appellants controlled what
Cherry told the tenants. Although there is some evidence that Cherry's
presettlement communications were on behalf of appellants as well as the Loutex
entities, and that Fournier and Wener knew of their content, this evidence does
not establish agency. See Walker v. Fed. Kemper Life Assurance Co., 828
S.W.2d 442, 452 (Tex. App.--San Antonio 1992, writ denied) (holding that, even
if person acts for another, agency does not exist if person is not under the
other's control as to means and details of accomplishing the task).
13.  Appellants' arguments that they cannot be
liable for fraudulent transfers merely attack the merits of this cause of
action; they do not negate a basis for the trial court's jurisdiction. See
id.; see also Ring Power Sys., 39 S.W.3d at 353 (holding that
trial court should rely only upon necessary jurisdictional facts and not reach
merits of case when deciding whether to exercise or decline jurisdiction).
14.  In light of our holding that appellants had
sufficient minimum contacts with Texas to support specific jurisdiction, we need
not address appellants' remaining issues. In addition, we do not address whether
the trial court's exercise of specific jurisdiction comports with traditional
notions of fair play and substantial justice because appellants do not raise any
complaints based on this component of the jurisdictional equation. See
Tex. R. App. P. 47.1 (providing that appellate court must only address issues
necessary to final disposition of appeal).